THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD HAYES, Defendant-Appellant.

First District (6th Division)    No. 1—98—3142

Opinion filed February 2, 2001.—Modified on denial of rehearing March 30, 2001.

Robert Hirschhorn, of Skokie, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Risa Renee Scott, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

In October 1996, the State charged defendant Ronald Hayes in a 27-count indictment for murder, attempted murder, aggravated vehicular hijacking, aggravated battery, armed robbery, aggravated kidnaping, and aggravated unlawful restraint. In March 1998, the circuit court conducted a jury trial. The evidence adduced at trial related to two separate acts allegedly committed by defendant. With respect to the first act, the trial court heard evidence relating to an early-morning incident in which defendant allegedly held several victims at gunpoint and stole a maroon Chevy Caprice belonging to one of the victims. The trial court also heard evidence relating to a second incident that occurred approximately 20 hours after the first. With respect to the second incident, the trial court heard evidence that defendant and two accomplices used the stolen car to abduct two victims, murder one, and attempt to murder the other. While the trial court heard evidence relating to both of these incidents, defendant was actually on trial for only the second incident.

During jury deliberations, one of the jurors indicated, for the first time, that he could not understand English very well and had difficulty following the testimony. The trial court replaced that juror with one of the alternates that had been already discharged.

The jury convicted defendant of murder, attempted murder, aggravated vehicular hijacking, armed robbery, and aggravated battery. The trial court denied defendant's motions for a mistrial and a new trial. In June 1998, the trial court sentenced defendant to 60 years' imprisonment for murder and 20 years for attempted murder, to be served consecutively. Additionally, the trial court sentenced defendant to 15 years for armed robbery, to be served concurrently. Defendant appeals, arguing that the trial court erred when it (1) dismissed the juror and replaced him with an alternate, rather than declaring a mistrial; (2) allowed the jury to hear evidence of other crimes; and (3) ordered defendant to serve consecutive prison sentences. We affirm.

## I. BACKGROUND

In September 1997, prior to trial, the State filed a motion to admit proof of other crimes. At the hearing on its motion, the State explained:

"It is our position that *** evidence [of the first incident], [j]udge,

is pertinent and relevant to our case for purposes of identity as well as connecting defendant to the murder itself by virtue of being arrested in the car that was used during the commission of the murder, or at least immediately preceding the abduction of the victim."

Defendant objected to the introduction of this evidence, arguing that it was cumulative and highly prejudicial. The trial court found that, under the circumstances, evidence of the first incident was material and relevant. The trial court further found that such evidence was not so prejudicial as to warrant exclusion.

In March 1998, a jury trial began. Ronnie Ramsey was one of the State's first witnesses. His testimony related to the prior crimes' evidence to which defendant objected. Ramsey testified that on October 31, 1996, at approximately 3:45 a.m., he was driving his maroon, 1984 Chevy Caprice to a friend's apartment. Ramsey parked his car in the parking lot and walked toward the building. As he walked, he saw two men walking ahead of him. Ramsey entered the building and, as he waited for the elevator, one of the men approached Ramsey and put a gun to his head. The record does not adequately identify this offender but the other offender, identified as the defendant, searched Ramsey's pockets.

Ramsey testified that the two men forced him into the elevator and began to beat him. They rode the elevator to the apartment of Ramsey's friend, Danny Roseberg. Defendant and the unidentified offender used Ramsey to gain access to Roseberg's apartment. Once inside, defendant and the unidentified offender led everyone in the apartment to a back room. They ordered the occupants to lie on the floor while they searched the apartment. The two offenders then started kicking the victims, shouting "I know you got some more money somewhere."

Defendant then took Ramsey's keys and went outside to locate the car. The other offender remained in the apartment and continued to hold the victims at gunpoint. When defendant returned, he advised his accomplice that he had found Ramsey's car. The two offenders then broke all the lights in the apartment, broke the doorknob on the front door, and fled. Ramsey tried to leave through the front door but could not. He eventually opened the door with a butter knife. He then called the police and provided a description of defendant, the unidentified offender, and the car.

The remaining testimony related directly to the second incident (i.e., the offenses for which defendant was charged in the instant case). Shamika Boykin testified that on October 31, 1996, at approximately 10 p.m., she and DeMarco Lofton drove to the store in

Lofton's car. After leaving the store, Boykin and Lofton were walking toward Lofton's car when a maroon Chevy Caprice pulled up to them. Two men, later identified as Andre Franklin and Ricky Harmon, jumped out of the car, displayed guns, and ordered Boykin and Lofton into the backseat of Lofton's car. Franklin and Harmon also got into the car. Defendant then stepped out of the Chevy Caprice, got into the driver's seat of Lofton's car, and began driving. Franklin and Harmon ordered Boykin and Lofton to keep their heads down.

Approximately 15 minutes later, they arrived at a Chicago Housing Authority building. Boykin testified that defendant asked her whether she was ready to die. Franklin and Harmon led Boykin and Lofton upstairs to an abandoned apartment. Defendant appeared in the apartment a few minutes later.

The three offenders searched Boykin and Lofton for valuables. Next, they ordered the victims to remove their clothes. Boykin testified that defendant and one of the other offenders brought Lofton into a bedroom. She heard Lofton beg for his life, followed by two gunshots. The offenders then brought Boykin into the bedroom and threw her onto Lofton's body. She heard defendant instruct Franklin and Harmon to kill her.

Boykin attempted to run but she was caught and carried back inside the apartment. One of the offenders threw a mattress on top of her and began firing bullets into the mattress. One bullet struck Boykin in the face. She testified that she held her breath and pretended to be dead while the offenders walked on her body to make sure they had killed her. The offenders left. Boykin lay on the floor for several minutes, then fled. She found a police officer and reported what happened. The officer went upstairs to check on Lofton. He was later declared dead.

On November 1, 1996, at approximately 4 a.m., police officers observed defendant driving a maroon Chevy Caprice that matched the description given by Ramsey. After checking the license plate number the officers activated their emergency lights. Defendant stopped the car and fled on foot. The officers caught defendant, performed a custodial search, and brought him to police headquarters.

While at police headquarters, one of the officers, Edward Spizziri, learned of a reported homicide that involved male, black offenders, and a maroon Chevy Caprice. As Spizziri learned of the homicide, he observed defendant place an object in his mouth. Spizziri ordered him to spit the object out. Boykin later identified it as her ring. Boykin also identified other items found on defendant as items belonging to Lofton.

Defendant then made an oral statement that was later reduced to

writing. After reviewing the statement and having an opportunity to amend or correct it, defendant signed it. Investigators read the statement into the record in open court. It essentially corroborated Boykin's testimony regarding the late-night abduction and shootings. The State rested and the trial court gave the jury its instructions. The jury began deliberation and the trial court discharged the two alternate jurors. Shortly after deliberation began, the jury foreman sent a note to the trial court, stating "I asked juror Jose Gonzalez if he understood what happened in the courtroom. He said no. I asked him if his primary language was Spanish and [whether] he would understand the English testimony. He said no."

The State suggested that Gonzalez be individually *voir dired*. The State noted that "[h]e was certainly *voir dired* during jury selection and there was no indication at that time by him or in his responses that he had any difficulty let alone impossibility of understanding the English language."

The trial court brought the entire jury back into the courtroom and questioned Gonzalez. That colloquy confirmed that Gonzalez had significant difficulty understanding English and that he could not adequately follow the evidence presented.[1]

The trial court then spoke with the attorneys in chambers. Defendant moved for a mistrial based on Gonzalez' inability to understand the testimony. The State disagreed and asked that the court replace Gonzalez with one of the alternate jurors. The trial court then instructed the sheriff to recall the alternate juror, Hermile Montes.

Approximately 2½ hours after being discharged, Montes returned to the courtroom. He advised the trial court that he had not spoken with anyone about the case and had not formed an opinion. Defense counsel and the State declined to ask any further questions.

The trial court brought the entire jury back into the courtroom and excused Gonzalez. The court then told Montes, "[y]ou are now going to be moved from the first alternate into the jury itself." The court then instructed the jury:

> "What you're going to have to do is start all your deliberations over again so that Mr. Montes can participate in the jury deliberations. And that's the only fair way that you can arrive at a verdict. And so you'll have to have your discussions again. And this is the only way that you're going to assure that [defendant] and the State get a fair trial."

---

[1]According to the transcript, Gonzalez specifically told the trial court that his English was poor and that he had difficulty following and understanding the evidence.

Following a subsequent recess, defendant raised an objection to Montes' placement on the jury. Defendant based his objection on the fact that "th[e] jury deliberated without him *** for 45 minutes. The man was discharged from the jury service and was back out in the population." Defendant also renewed his motion for a mistrial. The State responded by observing that Montes was *voir dired* and that Montes had not spoken to anyone or formed an opinion. The trial court noted that both defendant and the State examined and accepted Gonzalez, and indicated that its decision to replace Gonzalez with Montes would stand.

The jury returned and convicted defendant of murder, attempted murder, aggravated vehicular hijacking, armed robbery, and aggravated battery. The trial court denied defendant's posttrial motion and defendant now appeals, arguing that the trial court erred when it (1) dismissed the juror and replaced him with an alternate, rather than declaring a mistrial; (2) allowed the jury to hear evidence of other crimes; and (3) sentenced defendant to serve consecutive prison terms.

## II. ANALYSIS

### A. Juror Replacement Procedure

Defendant first argues that the trial court erred by replacing Gonzalez with alternate juror Montes rather than declaring a mistrial. Defendant further argues that, as a result, he suffered substantial prejudice warranting reversal. We disagree.

■ Defendant argues that Illinois and federal laws do not permit the procedure followed by the trial court. Specifically, defendant points to section 115—4(g) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—4(g) (West 1998)), which provides as follows:

"After the jury is impaneled and sworn the court may direct the selection of 2 alternate jurors who shall take the same oath as the regular jurors. Each party shall have one additional peremptory challenge for each alternate juror. If before the final submission of a cause a member of the jury dies or is discharged he shall be replaced by an alternate juror in the order of selection."

Defendant also relies upon Supreme Court Rule 434(e) (134 Ill. 2d R. 434(e)), which sets forth nearly identical language. Defendant contends that section 115—4(g) and Rule 434(e) limit the trial court's ability to utilize alternative jurors to circumstances arising before deliberations *begin*.

This very argument was raised in *People v. Henderson*, 45 Ill. App. 3d 798 (1977). In *Henderson*, the defendant was tried before a jury of 12 regular and 2 alternate jurors. At the conclusion of the jury instruc-

tions, the court discharged the two alternate jurors. The other jurors retired for deliberations. After 2½ hours of deliberation, one of the regular jurors suffered a heart attack. After stopping deliberations, the trial court recalled the two alternate jurors. The court questioned the alternate jurors about their activities during their discharge. The first alternate admitted talking to his wife about the case, but stated that his wife expressed no opinion. Both alternate jurors assured the court that they had reached no decision regarding Henderson's guilt or innocence. The trial court then recalled the first alternate juror. The jury returned a guilty verdict.

On appeal, the court noted as a threshold matter that defendant acquiesced in the trial court's actions and, therefore, could not challenge the "mere irregularity" on review. *Henderson*, 45 Ill. App. 3d at 800, 802. The court further noted that a mere irregularity in jury selection does not warrant reversal absent a showing that the irregularity prejudiced defendant. *Henderson*, 45 Ill. App. 3d at 805, citing *People v. Ward*, 32 Ill. 2d 253, 259-60 (1965). On that basis, the court declined to find plain error. *Henderson*, 45 Ill. App. 3d at 803. Indeed, the court noted:

> "We are of the opinion that absent a showing of prejudice, the error alleged was at most an irregularity *** and *** insufficient to constitute plain error. ***
>
> *** [T]he record shows that the alternate was extensively examined to re-establish his impartiality before the trial court permitted the substitution. The alternate stated that he had not talked to outsiders except his wife, about the case. He said that he had expressed no opinion to his wife because 'I hadn't made up my mind.' Nor had she expressed any opinions to him. Although he had mentioned to her some individual points about the case, he had 'just got in the door' before being called to return to the court. More than once the alternate stated positively that he was open minded and able to consider the evidence fairly. ***
> ***
> We find no evidence reflected in the record of any impermissible contact between the alternate juror and any outsider which prejudiced defendant. [Citations.] Any possibility that the alternate may have been influenced by his brief discussion with his wife is directly contradicted by the alternate's own testimony." *Henderson*, 45 Ill. App. 3d at 805-06.

The defendant in *Henderson* eventually brought his case into the federal court and before the Seventh Circuit. *Henderson v. Lane*, 613 F.2d 175 (7th Cir. 1980). The Seventh Circuit found that the substitution procedure was permissible under the sixth amendment (U.S. Const., amend. VI) and Rule 24(c) of the Federal Rules of Criminal

Procedure (Fed. R. Crim. P. 24(c)). The court first observed that the procedure preserved the "essential feature" of a jury, defined by the United States Supreme Court in *Williams v. Florida*, 399 U.S. 78, 100, 26 L. Ed. 2d 446, 460, 90 S. Ct. 1893, 1906 (1970), as " 'the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence.' " *Henderson*, 613 F.2d at 177, quoting *Williams*, 399 U.S. at 100, 26 L. Ed. 2d at 460, 90 S. Ct. at 1906.

The court further found:

> "The petitioner has not shown any irregularities in the initial selection of the alternate juror; the alternates were subject to the same selection procedures as the regular jurors. *** The alternate jurors heard the evidence and were instructed on the law with the regular jurors. The petitioner's defense attorney was present during the reinstatement proceedings and was permitted to examine the alternate juror about his activities after dismissal and the possibility that the juror had formed opinions about guilt or innocence during that time. It was only after the juror's assurance that he was still able to perform his duties properly and the defense counsel's statement that he saw no alternatives that the trial court reinstated the juror.
>
> *** [P]erhaps no procedure will be perfect for dealing with these difficult and unforeseeable circumstances ***. *** [However], [b]ecause the essential feature of the jury was preserved, the defendant's *** challenge to the substitution procedure must fail." *Henderson*, 613 F.2d at 178-79.

■ In the instant case, we conclude that the trial court's juror replacement procedure did not warrant reversal.[2] Montes was subject to the same selection procedures as the other jurors. He took the same oath as the other jurors. He heard the evidence and was instructed on

---

[2]Other jurisdictions have examined similar circumstances and, within the context of their own statutes and federal law, concluded that no general bar exists to preclude substitution of an alternate juror after deliberation has begun. See, *e.g.*, *People v. Dry Land Marina, Inc.*, 175 Mich. App. 322, 326, 437 N.W.2d 391, 393 (1989) (stating, "[w]e conclude that the decision of the trial court to excuse the ailing juror constituted a proper exercise of judicial discretion supported by fact and logic"); *Peek v. Kemp*, 784 F.2d 1479 (11th Cir. 1986) (holding that Georgia law supported juror replacement procedure and that defendant suffered no prejudice when the court failed to instruct the jury to begin its deliberations anew); *Commonwealth v. Connor*, 392 Mass. 838, 843-44, 467 N.E.2d 1340, 1345-46 (1984) (noting that the discharge of a deliberating juror is a sensitive undertaking but is permissible when the trial court ensures that good cause exists).

the law. He was discharged for a fairly short period of time before being recalled. Upon his return, he advised the trial court that he had not discussed the case with anyone since being discharged, nor had he formed any opinions about the case. The attorneys also had an opportunity to ask any questions. The jury was admonished to begin deliberations all over again to allow Montes to participate. Thus, Montes was not a stranger to the proceedings. The record contains no indication that he was unable or unwilling to render a fair decision. Based on these facts, we conclude that the substitution procedure, while irregular, did not prejudice defendant. Therefore, no reversible error occurred. See *People v. Lewis*, 165 Ill. 2d 305, 344 (1995) (finding that, assuming an irregularity in jury selection occurred, reversal is not required unless defendant has in some way been prejudiced); *People v. Whitlock*, 174 Ill. App. 3d 749, 768-69 (1988) (finding that, although jury selection procedure did not conform to the Code of Criminal Procedure, defendant must show that irregularities prejudiced him or resulted in substantial injustice).

We also note that the State presented overwhelming evidence to support the jury's verdict. In addition to testimony by the victims and police investigators and physical evidence, defendant signed a statement detailing his actions. Confessions are one of the most probative and damaging types of evidence that can be admitted against a defendant. *Arizona v. Fulminante*, 499 U.S. 279, 292, 113 L. Ed. 2d 302, 379, 111 S. Ct. 1246, 1255 (1991). Defendant himself does not dispute the jury's determination of guilt based on the evidence adduced at trial.

Defendant argues that the trial court's failure to readminister an oath prejudiced him. We reject this conclusory assertion, because the fact that the trial court did not readminister an oath to Montes is insufficient to warrant an automatic finding that defendant was prejudiced. As noted above, the record contains no indication that defendant suffered prejudice as a result of the substitution procedure.

Additionally, we find that defendant failed to properly preserve the oath issue for review and, therefore, we deem it forfeited. To preserve an issue, a party must raise it in a timely objection and in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The record indicates that defendant indeed objected to the replacement of Gonzalez with Montes. However, defendant based his objection on the fact that "th[e] jury deliberated without [Montes] *** for 45 minutes. The man was discharged from the jury service and was back out in the population." Defendant's objection had nothing to do with the trial court's failure to readminister a juror's oath. It is well settled that an objection on specific grounds forfeits assignments of error on other

grounds not specified. *People v. Steidl*, 142 Ill. 2d 204, 230 (1991). Had defendant wanted the trial court to readminister Montes' oath, he could have easily raised that precise issue by asking the court to do so. Failure to raise an error to the trial court with sufficient clarity and specificity results in forfeiture. See *Ciampi v. Ogden Chrysler Plymouth, Inc.*, 262 Ill. App. 3d 94, 106 (1994) (holding that objections must be made with sufficient particularity to identify to the court the error relied upon); *Franzoni v. Hart Schaffner & Marx*, 312 Ill. App. 3d 394, 400 (2000) (failure to object specifically to a witness' credibility constituted forfeiture of the issue on appeal); *People v. Brown*, 275 Ill. App. 3d 1105, 1113 (1995) (stating, "[b]ecause we find the defendant did not object with specificity to the effect of the whiskey bottle or magazines on his client's behalf at trial, these issues are waived"); *People v. Wilson*, 254 Ill. App. 3d 1020, 1060 (1993) (finding that "defendant has waived assignments of error for failure to object or to make specific objections"); *Henderson*, 45 Ill. App. 3d at 801 (stating, "[a]t no time prior to the verdict of the jury did defendant object or move for a mistrial on the basis of the issue now raised").

## B. Evidence of Other Crimes

Defendant also argues that the trial court erred by allowing the State to present evidence relating to the theft of Ramsey's car. Specifically, defendant contends that such evidence had no relevance and was offered in too broad a scope.

Evidence of other crimes in which a defendant may have participated is not admissible to show the defendant's propensity to commit crime. Such evidence, however, is admissible when relevant for any other purpose such as *modus operandi*, proof of motive, intent, identification, or absence of mistake. *People v. Richardson*, 123 Ill. 2d 322, 339 (1988). In fact, evidence of other crimes is admissible if relevant for any purpose other than to show propensity to commit crime so long as there is a similarity between the other crimes and the offense for which defendant is charged. *People v. Evans*, 125 Ill. 2d 50, 82 (1988). When such evidence is offered, the trial court must establish the purpose for which the evidence is offered and weigh the relevance of the evidence against its prejudicial impact. *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991). The admissibility of such evidence is a matter within the sound discretion of the trial court, which will not be reversed on review absent an abuse of that discretion. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). An abuse of discretion will be found "only where the trial court's decision is arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court." *Illgen*, 145 Ill. 2d at 364.

■ We find that the trial court did not abuse its discretion in allowing the State to present evidence of the early-morning incident for purposes of establishing defendant's identity. Ramsey's testimony established that defendant had possession of the maroon Chevy Caprice that he used to abduct Boykin and Lofton. As the State noted in its motion to admit evidence of the early-morning incident, defendant denied that fact during testimony in his pretrial motions. Defendant has simply failed to present a persuasive argument that evidence of the early-morning incident had no relevance to the instant case.

Defendant also argues that the trial court allowed the State to admit an excessive number of details from the early-morning incident. However, defendant fails to identify a single example of a detail that he defines as excessive or a single citation to the record where such a detail was adduced. In any event, an independent review of the record does not support defendant's contention. Additionally, we again note that the State presented overwhelming evidence of defendant's guilt, thus negating the inference that evidence of the early-morning incident was highly prejudicial. Finally, we note that the trial court issued a limiting instruction, reminding the jury that evidence of the early-morning incident was "received on the issue of the defendant's identification and may be considered by you only for that limited purpose." A limiting instruction "substantially reduce[s] any prejudicial effect created by the admission of the prior-offense evidence." *Illgen*, 145 Ill. 2d at 376. The trial court did not abuse its discretion.

## C. Sentencing

■ Defendant also argues that the trial court improperly ordered him to serve consecutive prison sentences. This sentence, defendant argues, violates *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). In *Apprendi*, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. We disagree with defendant's contention on this point. In *People v. Sutherland*, 317 Ill. App. 3d 1117 (2000), and *People v. Primm*, 319 Ill. App. 3d 409 (2000), this court held that *Apprendi* does not apply to consecutive sentencing because two consecutively served sentences do not constitute a single sentence that extends beyond the statutorily imposed maximum. Therefore, we find that defendant's sentence was proper.

## III. CONCLUSION

In sum, we find that, under these facts, the irregularity that oc-

curred during deliberation did not warrant reversal. We do not hold that this juror replacement procedure is, in all cases, a proper solution to this unusual dilemma. Ideally, the trial court should ask the defendant whether he would waive his right to a jury of 12 so that deliberations can proceed with 11 jurors. See *People v. McPherson*, 306 Ill. App. 3d 758, 763 (1999). Of course, the defendant may refuse. We also note that, under different circumstances, a mistrial may be necessary.[3] Each case must turn on its own facts. Here, we find that the replacement procedure utilized in this case, while irregular, was within the trial court's discretion and did not warrant reversal. See *People v. Hudson*, 157 Ill. 2d 401, 448 (1993) (stating "discharge of a juror is a matter within the trial court's discretion and prejudice must be shown to warrant reversal"). In fact, we conclude that the trial court handled this difficult and unusual situation in a fair and reasonable manner, with an eye toward protecting both sides' rights to an impartial and just outcome. We further find that the trial court did not err in allowing the State to present evidence of the early-morning incident and that defendant's sentence was proper.

For the foregoing reasons, we affirm defendant's conviction.

Affirmed.

O'BRIEN and GALLAGHER, JJ., concur.

---

[3]For example, the trial court must not replace a deliberating juror if the request for discharge stems from the juror's minority views or doubts regarding the sufficiency of the evidence. *United States v. Symington*, 195 F.3d 1080, 1085 (9th Cir. 1999). When the record discloses a reasonable possibility that the impetus for a juror's discharge arises from the juror's views on the case's merits, the trial judge has two options: instruct the jury to continue deliberating or declare a mistral. *Symington*, 195 F.3d at 1087. The trial court's inquiry in this matter must be made delicately so as not to intrude on the secrecy of the jury's deliberations. *Symington*, 195 F.3d at 1087. Our review of the record in this case discloses no such reasonable possibility.