THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY GALLANO, Defendant-Appellant.

First District (4th Division)   No. 1—03—1432

Opinion filed December 30, 2004.

Michael J. Pelletier and Shaena M. Fazal, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THEIS delivered the opinion of the court:

Following a jury trial, defendant Timothy Gallano was convicted of first-degree murder and concealment of a homicidal death and sentenced to concurrent prison terms of 60 years and 5 years, respectively. He contends on appeal that (1) he was denied his right to a unanimous jury verdict when the trial court dismissed a juror during deliberations after the juror had expressed to the court his reasonable doubt as to defendant's guilt; (2) the trial court erred in allowing a witness to invoke his fifth amendment right against self-incrimination without conducting a hearing to determine whether he had a valid basis for invoking that right; and (3) his 60-year sentence

for first-degree murder was excessive. For the following reasons, we reverse defendant's convictions and remand for a new trial.

BACKGROUND

The following facts were adduced at defendant's trial. Arlene Bravo testified that on September 20, 1999, her daughter, Stacy Bravo, left their home at 9:30 p.m. to work at a local bar and that was the last time Arlene saw Stacy alive. Stacy's brother, John Bravo II, testified that he was introduced to defendant in early September 1999 as Stacy's boyfriend. On September 25, 1999, John became alarmed when Stacy did not appear at her cousin's wedding. The following Tuesday, John saw defendant in the parking lot of a local bar in Blue Island getting out of Stacy's car. When John asked defendant about Stacy's whereabouts, defendant told John that he had seen Stacy the Friday before the wedding, that she had gone to a party with a girlfriend and never came back, and Stacy lent him the car to run errands before she went to the party with her girlfriend.

The next day, John went with his father to Jack Moretti's house, where defendant was living at the time, to pick up Stacy's car. John asked defendant again if he had heard anything from Stacy and defendant replied that he had not heard anything and had not seen her since the Thursday before the wedding. John confronted defendant with the discrepancy because defendant had previously told John that the last time he saw Stacy was the Friday before the wedding. Defendant responded that he could not remember if it was Thursday or Friday and could not remember the girlfriend's name that she went out with that night. John further testified on cross-examination that he was aware of Stacy's drug problem and that he knew she had received treatment through a drug rehabilitation program. He denied that she ever acted aggressively or violently when he observed her using drugs.

Hope Bravo, Stacy's former sister-in-law, testified that the Wednesday before the wedding, on September 22, 1999, she was working at a local bar in Blue Island. At about midnight, she saw someone driving by the bar in Stacy's car. Hope thought it was unusual because Stacy should have been working at that hour. Shortly thereafter, defendant came into the bar, flailing his arms around, asking, "Where is Stacy?" in an animated voice. Hope thought it was odd that defendant did not know where Stacy was because he and Stacy were inseparable. When Hope said to defendant, "What did you do to her?" he was extremely nervous and sweating. Defendant looked her in the eye and began to cry. He kept repeating, "I am sorry. I am so sorry." Defendant kissed Hope on the forehead and immediately left the bar,

got into Stacy's car, and drove off. On cross-examination, Hope testified that she did not contact police after defendant left the bar. She also testified that she was familiar with Jack Moretti. He was known around town because of his appearance, which she likened to Jerry Garcia. On occasion, she saw Moretti and defendant at the bar where Stacy worked. Hope saw Moretti driving Stacy's car the week after defendant spoke to Hope.

Arlene Bonta testified that she lived on a farm in Mokena, Illinois. She had known defendant for about 25 years, and he had lived with her from 1993 to 1994. In the fall of 1999, Bonta received a telephone call from defendant, asking her if he could store a motorcycle frame and some parts in her barn. Two weeks after the phone call, defendant arrived at Bonta's farm with a motorcycle frame and a blue barrel. The barrel was too heavy for defendant to carry and Bonta's son helped defendant move the barrel into the barn. After the barrel was unloaded from defendant's trailer, Bonta's dog was sniffing the barrel. Bonta's son also testified that the barrel had an odor. Defendant told them that the dog was probably sniffing the barrel because a dead possum was thrown in there by his girlfriend who was not happy with him. Bonta further testified that defendant returned to her farm in the summer of 2000 with Moretti, whom she described as "scary looking." At that time, they picked up the motorcycle frame, but left the barrel behind.

Sergeant Tom Wetherald of the Illinois State Police testified that on January 31, 2002, he was assigned to assist with the missing persons case of Stacy Bravo. He accompanied Moretti, who was in custody at that time for passing bad checks, to Moretti's residence in Blue Island. When Wetherald entered the basement, he saw what he believed to be dried blood on the walls and the floorboards. The material on the floorboards was later determined to be human blood. On February 4, 2002, Wetherald and other officers took defendant into custody and accompanied him to the Bonta farm, where Wetherald observed a blue plastic 55-gallon drum. The drum was then taken to the coroner's office.

Illinois State Police biologist Dan Gandor testified that he took DNA samples from the floorboards in the basement of Moretti's residence, as well as swabs from Arlene and John Bravo. The parties stipulated that the blood on the floorboards belonged to the biological daughter of Arlene and John to a degree of 99.99% certainty.

Doug Hoglund, deputy chief of the Blue Island police department, testified that he had information that Moretti and defendant were involved in Stacy's disappearance and that Moretti's arrest for possession of stolen checks led police to defendant. Moretti consented to a

search of his home, where the police recovered explosives, drug paraphanalia, marijuana, shotguns, ammunition, mercury, and a passport. Defendant did not reside there at the time these items were discovered. Hoglund further testified that he interviewed defendant following his arrest. After advising defendant of his rights, defendant agreed to speak with him. Defendant was informed that the police were investigating Stacy's disappearance. According to Hoglund, defendant initially told him that he and Stacy were no longer dating and that he did not know of her whereabouts. When Hoglund told defendant that police had information that defendant did know what happened to Stacy, defendant "hung his head" and began to cry.

Defendant then told Hoglund that he was living with Stacy in September 1999. When she arrived home from work one morning, they had an argument and Stacy pointed a gun at him. He took the gun away from her and shot her in the head more than once. After he shot Stacy, Moretti came out of a bedroom where he had been sleeping. He and Moretti put Stacy's body into a large plastic bag and left it in the trunk of Stacy's car for a few days. They then put the body into a blue 55-gallon plastic drum, filled it with cement and put motorcycle parts on top of it. A few days later, defendant took the barrel to the Bonta farm. Defendant then accompanied the officers to the Bonta farm, where the barrel was discovered.

Assistant State's Attorney Terry Reilly testified that on February 5, 2002, he interviewed defendant in the presence of Officer Hoglund. Defendant gave a videotaped statement after being advised of and waiving his rights. ASA Reilly testified that there was a difference in the oral statement that defendant gave to Hoglund and the videotaped statement he later made. Reilly stated that in the oral statement to Hoglund, defendant said that he took the gun away from Stacy and shot her several times. When he spoke with Reilly in the videotaped statement, defendant said that Stacy had the gun, there was a struggle for it, and the gun went off. Reilly also testified that defendant told him that he did not mean for the incident to happen.

Forensic pathologist Bryan Mitchell testified that on February 5, 2002, he conducted an autopsy of Stacy Bravo's body. Stacy died as a result of multiple gunshot wounds to the head, causing laceration of the brain and fracturing of the skull. His examination revealed a gunshot entrance wound on "the right side of the head just above and behind the right ear." The path of the bullet was from back to front. There were no exit wounds. He observed a keyhole-shaped wound suggesting that there had been more than one bullet that entered the area. Mitchell removed what appeared to be five pieces of bullet jacketing and two pieces of lead from the skull. He explained that when

multiple bullets are fired into the same area, the bullets will collide into each other, causing the bullets to fragment inside the skull. According to Mitchell, the gun was fired right up against her head. He had no opinion as to whether the wounds were a result of a struggle or an execution. With the exception of the skull, he found no evidence of injury to any other part of her body.

Wetherland testified for the defense regarding a report that he generated during the investigation. Therein, he stated that " '[defendant's] initial statements indicated that Bravo was shot during a struggle with [defendant].' " The parties also stipulated that Stacy received outpatient drug treatment and counseling between April 1997 and October 1997, and that during that time, she attended 30 counseling sessions.

Defendant testified that he met Stacy and Moretti through mutual friends. While defendant lived in Bourbonnais, he would often stay with Moretti at his apartment. According to defendant, he "looked up" to Moretti, but soon realized he was a drug dealer who was "not on the level." Defendant did not do drugs because he had a commercial driver's license and was required to participate in drug screening. Defendant had known Stacy for six months before the shooting. She would often stay overnight at Moretti's place. They very seldom had disputes, and when they did, they talked very easily and openly about them. Defendant stated that he found out that Stacy was taking drugs. They discussed the problem, and she agreed that she would not do them anymore. According to defendant, Moretti made Stacy sell cocaine at her workplace and Stacy was not happy with that arrangement. Defendant testified that he confronted Moretti about the situation, and Moretti told him it was none of his business. According to defendant, Moretti was always asking Stacy about money, and at the time of her death, she owed Moretti $4,000.

Defendant further testified that on September 20, 1999, he was at Stacy's parents' house earlier in the day. Stacy went to her pool league and a friend of his picked him up. At about 10 p.m., he was sitting in the basement watching television. Moretti was in the next room asleep. Stacy came home with another woman and went into Moretti's room. They had a conversation, but he could not hear what they were discussing. Then Stacy came out and had a conversation with the woman. The two women were smoking marijuana. At some point, the other woman left. Stacy was upset and was acting out of character. He had only seen her behave that way once before when she and Moretti got into a verbal confrontation and she threw some bottles around the bar.

According to defendant, Stacy then walked up to him with a

notebook in one hand and a gun in the other hand. She pointed the gun at defendant about two feet away from him. Defendant reached up and grabbed the hand holding the gun. He pushed Stacy back into some chairs in front of a workbench. "It seemed like when she hit the chairs, the gun went off." He did not know how many times it went off. His hand was never on the trigger. After the gun discharged, Moretti came in and told defendant they had to get rid of the body because Moretti had drugs in the house and did not want the police there. Defendant did not want to have anything to do with hiding the body. He reluctantly agreed to help Moretti put Stacy's body into a plastic bag and they placed her in the trunk of her car. According to defendant, Moretti cleaned the blood off the basement floor and was upset because defendant did not help him.

Defendant drove to see his friend who was a training officer for the Mokena police department. He was not at home. Defendant attempted to contact him four or five times over a period of time to no avail. The body remained in the trunk of the car for a few days. He and Moretti then placed the body into a 55-gallon plastic drum belonging to Moretti. They filled it with cement and motorcycle parts and left it on the side of the house for a few days. It was defendant's idea to bring the drum to the Bonta farm. Defendant further testified that he did not intend to shoot Stacy and did not have the gun in his hand until after she had been shot. He believed the gun was the same one that he had seen Moretti with in the past for protection.

Following deliberations, the jury found defendant guilty of first-degree murder and concealment of a homicidal death. He was subsequently sentenced to a concurrent prison term of 60 years and 5 years, respectively. His motions for a new trial and for resentencing were denied.

## ANALYSIS

### A. Discharge of Juror Litke

Defendant contends that he was denied his right to a fair trial when the trial court dismissed a juror during deliberations who had expressed reasonable doubt. The following facts are relevant to a disposition of this issue. Prior to trial, the court conducted *voir dire* by questioning potential jurors, and by giving the State and defense an opportunity to submit questions and exercise challenges. Each juror was asked, "[W]ere you ever arrested, charged with, or convicted of a crime other than a minor traffic offense?"

During the process, the State made challenges for cause as to potential jurors who were untruthful with respect to their criminal

backgrounds. The trial court granted the State's motion to dismiss two potential jurors for cause. Thereafter, the State also made a motion to dismiss prospective juror Todd Atkins because, although he admitted that he had an arrest for mob action in 1986, in March of 1996, he was also charged with battery, and in January 1997, he was charged with delivery of cannabis. The trial court denied the motion for cause, stating "[h]e did indicate sufficiently he has been in fact arrested. The fact that he has many, many more is, well, just icing on the cake." He was then dismissed by the State on a peremptory challenge.

After 12 jurors were empaneled, the court sought three alternate jurors. The prospective alternates were asked, "[W]ere any of you or anyone close to you ever a victim of a crime before?" Prospective alternate Frank Litke was questioned individually by the court as follows:

"A. [Mr. Litke] My son's mother was murdered. My two sons. Twelve years ago.

Q. Was anyone arrested as a result of that?

A. Yes.

Q. Were you in any part of the court proceedings in any way, sir, such as a witness?

A. No.

Q. Now the fact that someone who was related closely was the victim of a homicide in the past, would that have any bearing or impact upon you whether or not you could be a fair and impartial juror in this case, sir?

A. No.

Q. If you were selected as a juror in this case, Mr. Litke, could you rule only according to the evidence you hear, the law that I would give you, be able to give both sides here a fair trial?

A. Yes."

The court next asked the panel: "[W]ere any of you or anyone close to you ever arrested for, charged with, or convicted of a crime other than a minor traffic offense?" Mr. Litke apparently raised his hand and stated as follows:

"Q. And Mr. Litke?

A. Well, I got to go back to the—my children were kidnapped, too, eight years ago, by some in-laws.

Q. In-laws, that goes back to the victim question.

A. Yes.

Q. The in-laws, were there criminal charges placed on them?

A. No. I went to the Supreme Court of Montana. I had to go through two states. They were trying to, they put a false front of like they had any kind of custody rights to my children.

"Q. I understand, this was a—

A. Eight year process.

Q. —a custody situation which was bordered on the criminal, is that what you consider it to be?

A. Yes. They took advantage of their mother's death and shipped them out of State real fast before I could find out what's going on.

Q. Would this have any bearing on you, again, Mr. Litke, whether you would be fair and impartial in this case?

A. No."

Later, the court questioned each potential alternate individually. Litke indicated that he was 35, married and unemployed with three children. He stated that he would not give a police officer any more or less weight than any other witness, and that he did not hold any bias or prejudice against a person charged with a crime. He was then asked about his ability to be fair and impartial and whether he could sign a guilty or not guilty verdict form. He responded that he could be fair and impartial, and could sign a guilty or not guilty form depending on whether the State proved defendant's guilt beyond a reasonable doubt. The court went on to question other potential alternates and then Litke volunteered the following information:

"A. But you passed up, when I was 18 years old, I pleaded guilty to taking a survey lens out of the back of a pickup truck.

Q. Alright, I'm sorry, I guess I just left that open out there. I went with the other individuals.

Q. Alright, when you were 18, obviously, the matter is all done with in court at this time. The fact that you were once arrested and convicted of an offense in the past have any bearing or impact upon you whether or not you could be fair and impartial?

A. No."

The State had no questions for the potential alternates. The State used its one and only peremptory challenge on prospective alternate Catrina Stubbs. The defense used its one and only peremptory challenge on prospective alternate Patricia Jaroszewski. Litke was then empaneled as the first alternate juror. Subsequently, in the middle of the trial, one of the 12 jurors informed the court that she was having difficulty securing child care and did not foresee the problem resolving. The trial court excused the juror and replaced her with alternate Litke.

On March 28, 2003, at the close of the case, the alternate jurors were dismissed and the 12 jurors began deliberating at 2:55 p.m. At about 6:10 p.m., approximately three hours later, the court received a note from the jury room as follows:

"I Frank D. Litke, Jr., do not feel comfortable signing a guilty verdict of first or second degree murder and everyone else does. My mind cannot be changed because I feel some reasonable doubt."

The note was signed by Litke and the jury foreman, Joi Bauers. After receiving the note from the trial court, the State proceeded to construct a background check of Litke "based on our suspicions after his name came out, that he was a holdout and hearing what he had said about his—the mother or, sorry, the mother of his children being murdered." Based upon the information it received, the State argued that Litke lied during the course of *voir dire* and moved to have Litke dismissed from the jury. The defense objected. The court expressed concern regarding the potential perjury and then granted the State's request that the jurors stop deliberating.

The State then indicated that its research revealed information based upon statements Litke gave during *voir dire* regarding his supreme court case in Montana. That case was a published opinion and indicated that Mr. Litke was arrested on January 3, 1988, and subsequently incarcerated in Arizona state prison as a result of a revocation of probation for a previous theft conviction.[1] Litke was imprisoned for that offense for five years from March 1988 to January 1993.

In addition, the State conducted a Federal Bureau of Investigation search which indicated that Litke had been arrested seven times. On February 23, 1987, he was arrested for violation of a court order and armed burglary. The State further informed the court that it had contact with the Maricoppa County prosecutor's office in Arizona. Through Litke's state identification, it was discovered that he was arrested in July 1987 for assault and interference with judicial procedure. In December 1987, he was arrested for theft. On February 20, 1987, he was arrested for criminal trespass, and February 14, 1987, he was arrested for interference with judicial process and armed robbery. On April 25, 1987, he was charged with a violation of his probation and sentenced to five years' imprisonment. Mr. Litke was also arrested in January 1988 for burglary tool possession and on August 6, 1987, for obstruction of court, kidnapping, and aggravated serious injury. The charges were later dropped after he aided in the case as a State's witness.

Based upon Litke's untruthfulness, the State argued that he could not be trusted to follow his oath and moved to excuse Litke from the jury. In response, the defense reminded the court that it refused to dismiss prospective juror Atkins for cause when he was not forthcom-

---

[1]Defendant points out that Litke stated in *voir dire* that he was convicted of theft when he was 18, which would have been in 1985. Thus, defendant argues that it is likely that Litke's five-year sentence in Arizona for revocation of probation, which he began serving in 1988, was related to the theft charge.

ing with all of his prior arrests. The court stated that instance "was nothing of the magnitude and degree of what I have heard regarding Mr. Litke."

The court then reopened the *voir dire* of Litke. The following questions and answers were given:

"Q. During voir dire examination, you made several statements to the judge when he gave you questions, correct?

A. Yes.

Q. And you indicated that you were involved in a child custody dispute, correct?

A. Yes.

Q. And this child custody dispute originated out of—was filed in Montana, correct?

A. And Arizona first.

Q. Arizona first. Then the case ended up in Montana, correct?

A. Yes.

Q. Is that yes?

A. Yes.

Q. In Montana, the Supreme Court of Montana heard this case and published an opinion, correct?

A. Yes.

Q. And when they did that, your name is Frank D. Litke, correct?

A. Junior, yes.

Q. Frank D. Litke, Jr., okay. And in that case what happened was your children [were] taken while you were in prison in Arizona, correct?

A. Yes.

Q. In fact, you were in Arizona prison for five years, correct?

A. Yes.

Q. Okay. And that was for violation of a theft charge, correct?

A. Yes.

Q. And besides that charge, you had six other arrests in the state of Arizona, correct?

A. Yes.

Q. Besides that one?

A. Yes.

Q. And you served your prison sentence from—you were admitted to the Arizona Department of Corrections on March 11, 1988, correct, approximately that time?

A. Yes.

Q. And then you were released January 2, 1993, correct?

A. Yes.

\* \* \*

THE COURT: Mr. Litke, you are excused from this jury, sir."

At that time, the jury was informed that one of its members was

dismissed. The jurors were sent home over the weekend and were admonished not to discuss the case with anyone and to return on Monday. The court additionally entered an order requiring the sheriff to contact the alternate jurors who had been previously released and to have them return to court on Monday and not discuss the case with anyone.

On Monday, the State argued that the reason it made its motion for Litke to be removed was that "Mr. Litke would be manifestly biased in this case; that being the fact that not only did he lie about his background, but included within his background were material elements that could be a bias for both possibly the defense and the State in this case." Defendant then objected to the case continuing and stated that he was renewing his motion for a mistrial. The court, in considering defendant's motion for a mistrial, stated in pertinent part:

> "It was the Court's position that Mr. Litke was not truthful to the Court. Now if Mr. Litke, as my question to him did indicate this, the Court would have, in fact, been able to question him as well as each of the sides here whether or not because of his extensive background, not only being in the penitentiary, but his extensive arrest background and other problems whether that would have any affect [sic] upon him being a fair juror. This Court as well as the parties were deprived of this because Mr. Litke—because of his untruthfulness and deceit, and, as such, the Court felt obligated to remove him from the jury. Now, this by itself does not warrant a mistrial at this juncture, and the Court will deny a mistrial at this juncture."

Janet Streck, a released alternate juror, returned to court on Monday as the court requested. She told the court that she had not discussed the case with anyone. She then took her oath. The court instructed the jury that Litke had been released from his duty as a juror, but that the reason for his dismissal "has nothing to do with the case or any prior deliberations." He then asked the remaining 11 jurors if any of them could not continue to deliberate in light of anything that Litke may have said or done during deliberations. None of the jurors raised his hand. The court then informed the jurors that Ms. Streck would now be deliberating with them and that they were to begin their deliberations anew. The jury deliberated for 1½ hours before it returned with a guilty verdict for first-degree murder and concealment of homicidal death.

■ In Illinois, a defendant has a right to a unanimous jury verdict. Ill. Const. 1970, art. I, § 13; 725 ILCS 5/115—4 (West 2002); *People v. Lobb*, 17 Ill. 2d 287, 298, 161 N.E.2d 325, 331 (1959) ("The right of

trial by jury as it existed at common law is the right to have the facts in controversy determined, under the direction and superintendence of a judge, by the unanimous verdict of twelve impartial jurors who possess the qualifications and are selected in the manner prescribed by law"); *People v. Scott*, 243 Ill. App. 3d 167, 169, 612 N.E.2d 7, 9 (1993).

Defendant argues that the discharge of juror Litke after it was known that he was the lone holdout juror violated defendant's right to a unanimous verdict because the dismissal allowed the State to obtain a conviction despite its failure to persuade all of the jurors that defendant violated the law. We review claims of manifest constitutional error *de novo*. *People v. Burns*, 209 Ill. 2d 551, 560, 809 N.E.2d 107, 114 (2004). Defendant cites several federal cases in support of his argument. These cases hold that the trial court must not replace a deliberating juror if the request for discharge stems from the juror's minority views or doubts regarding the sufficiency of the evidence. *United States v. Symington*, 195 F.3d 1080 (9th Cir. 1999); *United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997); *United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987); see also *People v. Hayes*, 319 Ill. App. 3d 810, 821 n.3, 745 N.E.2d 31, 42 n.3 (2001) (citing, in *dicta*, the holding in *Symington* with approval).

The test articulated in *Symington* is as follows: "[I]f the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror. Under such circumstances, the trial judge has only two options: send the jury back to continue deliberating or declare a mistrial." *Symington*, 195 F.3d at 1087. (Emphasis in original.) In *Symington*, the court explained that "[t]he reason for this prohibition is clear: 'To remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict.' " Symington, 195 F.3d at 1085, quoting *Thomas*, 116 F.3d at 621. If a court could discharge on that basis, then the right to a unanimous verdict would be illusory. *Brown*, 823 F.2d at 596.

> "A discharge of this kind would enable the government to obtain a conviction even though a member of the jury that began delibera-tions thought that the government had failed to prove its case. Such a result is unacceptable under the Constitution." *Brown*, 823 F.2d at 596.

Several state courts have also expressed caution about allowing a trial court to discharge a juror during deliberations when done in a manner that "appears to facilitate the rendering of a guilty verdict." *Garcia v. People*, 997 P.2d 1, 8 (Colo. 2000). In *Garcia*, the court stated

"[w]henever it appears that a jury may be reconstituted in order to reach a particular result, the guarantee of a fair and impartial jury is meaningless to a defendant and creates unwarranted mistrust and suspicion among members of the public." *Garcia*, 997 P.2d at 8. See generally *State v. Elmore*, 121 Wash. App. 747, 90 P.3d 1110 (2004).

We agree that where the record shows any reasonable possibility that the impetus for a juror's dismissal during deliberations stems from his views regarding the sufficiency of the evidence, the dismissal of that juror constitutes error. This rule of law ensures that a defendant's constitutional right to a unanimous jury verdict is protected and guarantees that a juror will not be excused in a manner that appears to facilitate or manipulate the rendering of a guilty verdict. Thus, the question for our consideration must be whether there was a reasonable possibility that the impetus for Mr. Litke's discharge arose from his views regarding his reasonable doubt and the possibility of a hung jury.

The State maintains that the impetus for Litke's dismissal was solely due to his untruthfulness during *voir dire*. The record in the present case belies such a conclusion and the State's assertion places the cart before the horse. During deliberations, Litke sent a note to the trial court which was also signed by the jury foreman. The note explicitly revealed that he was the lone holdout juror and that his mind could not be changed because he had "reasonable doubt." Once the note was revealed to the parties, the record indicates that the State then proceeded to construct a background check of Litke "based on [its] suspicions *after his name came out, that he was a holdout* and hearing what he had said about his—the mother or, sorry, the mother of his children being murdered." (Emphasis added.) The State conceded, both in the record and at oral argument on appeal, that the impetus for its investigation into Litke's background was the knowledge that Litke was the lone holdout juror. Thus, it was not until it was aware of Litke's status as the lone holdout juror that it sought to research his criminal record, which it could have done during *voir dire*.

■ Where the State used its resources to prevent a hung jury, it facilitated the rendering of a guilty verdict, and there was more than a reasonable possibility that the impetus for Litke's dismissal stemmed from his views regarding the sufficiency of the evidence. Once Litke's status as a holdout juror was revealed, the trial court had two choices: (1) send the jury back to continue deliberating; or (2) declare a mistrial. However, under these unusual circumstances, once the trial court was made aware of Litke's untruthfulness, and the court determined in its discretion that Litke should be discharged for cause, the court's only option was to declare a mistrial.

The State maintains that defendant was not prejudiced by the removal and replacement procedures followed by the trial court, citing *Hayes*, 319 Ill. App. 3d 810, 745 N.E.2d 31, in support. During jury deliberations in *Hayes*, one of the jurors indicated that he was unable to understand English well and had difficulty following the testimony. The trial court replaced that juror with an alternate, and the defendant argued on appeal that the law did not permit the replacement of a juror during deliberations. *Hayes*, 319 Ill. App. 3d at 811, 815, 745 N.E.2d at 34, 37. The appellate court held that, under these facts, the substitution procedures were permissible. *Hayes*, 319 Ill. App. 3d at 818, 745 N.E.2d at 39.

Initially, defendant does not dispute that once Litke was removed, the trial court followed the proper procedures in substituting alternate juror Streck. Furthermore, *Hayes* is distinguishable for the very reason that it did not involve the circumstances we are faced with here with respect to a holdout juror. Indeed, in *Hayes*, the court noted that each case must be determined on its own facts and that "under different circumstances, a mistrial may be necessary." *Hayes*, 319 Ill. App. 3d at 821, 745 N.E.2d at 41, citing *Symington*, 195 F.3d at 1085. Accordingly, for all of the foregoing reasons, on this record, we are compelled to reverse defendant's conviction and remand for a new trial.

B. Exclusion of Alonzo Pratt's Testimony

Despite the necessity for a new trial, we will address the issue involving the exclusion of Alonzo Pratt's testimony as it is an issue that is likely to arise on retrial. Defendant contends that the trial court erred when it allowed Pratt, a potential witness for the defense, to invoke his fifth amendment right against self-incrimination where it failed to conduct a proper hearing to determine whether, in fact, Pratt had a valid basis for invoking that right.

The following facts are pertinent to a disposition of this issue. Prior to trial, defendant informed the trial court that he intended to call Pratt to testify and sought to preclude Pratt from exercising his fifth amendment right to avoid testifying at defendant's trial. Alternatively, defense counsel sought to admit Pratt's affidavit taken by an investigator which stated as follows:

> "Some time in February, 2002, I met Jack Moretti when he was placed in division eleven. After some time, Jack Moretti started talking to me about his case and about a homeless wimp-type guy he had taken under his wing in Blue Island, Illinois. Jack Moretti told me that he had recruited a girl to sell cocaine for him out of a bar in Blue Island. Jack Moretti told me that he was f-cking this girl and that after a while, she owed him money as a result of her

selling cocaine for him. Jack Moretti told me that this girl took a liking to the homeless wimp-type guy he had taken under his wing, and this caused him to become jealous of the homeless wimp-type guy. Jack Moretti told me that he was also jealous of the homeless wimp-type guy because the homeless wimp-type guy was a motorcycle mechanic, something that he always aspired to. Jack Moretti further told me he had an impotency problem and that this girl was f-cking the homeless wimp-type guy because he himself could not get hard with her.

Jack Moretti told me that one night, while he and this girl were arguing over money in his apartment, he convinced her to pull a gun on the homeless wimp-type guy to scare him. Jack Moretti told me that this girl did as he instructed her to do, and she was then shot and killed in his apartment that night. Jack Moretti told me that after the girl was shot, he suggested to the homeless wimp type-guy that they get the body out of his apartment and bury it somewhere. Jack Moretti told me that he wanted to get the body out of his apartment because he didn't want the police coming into his apartment and finding his guns and his drugs.

Jack Moretti told me he had worked as a snitch for the Blue Island Police Department for a long time. Jack Moretti told me that everything he told the police about the shooting of the girl in his apartment that night was bullshit. Jack Moretti told me that he lied to the police, that he put a case on the homeless wimp-type guy to help himself in his own fraud and drug cases that are pending. Jack Moretti told me that he lied about the homeless wimp-type guy and will continue to lie about him in order to get all the help he can in his own cases. Jack Moretti told me he expects to get immunity in exchange for his testimony against the homeless wimp-type gray [sic]."

■ Defendant asserts that Moretti's statement to Pratt supports defendant's theory of self-defense. We need not address the issue of whether Pratt could properly invoke the fifth amendment right because defendant's offer of proof as to his potential testimony would have been inadmissable hearsay at trial and would not have fallen within a recognized exception. The admission of evidence is within the sound discretion of the trial court and should not be reversed absent a clear showing of abuse of discretion. *People v. Tenney*, 205 Ill. 2d 411, 436, 793 N.E.2d 571, 587 (2002); *People v. Bowel*, 111 Ill. 2d 58, 68, 488 N.E.2d 995, 1000 (1986). Illinois has long held that "[g]enerally an extrajudicial declaration not under oath, by the declarant, that he, and not the defendant on trial, committed the crime is inadmissible as hearsay though the declaration is against the declarant's penal interest." *Bowel*, 111 Ill. 2d at 66, 488 N.E.2d at 999, citing *People v. Tate*,

87 Ill. 2d 134, 143, 429 N.E.2d 470, 475 (1981). An exception to this rule exists where justice requires that the declaration be admitted. *Bowel*, 111 Ill. 2d at 66, 488 N.E.2d at 999.

■ In *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), the United States Supreme Court held that a declaration against penal interest is admissible where there is sufficient indicia of trustworthiness in that (1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and against the declarant's interest; and (4) there was adequate opportunity for cross-examination of the declarant. *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49. These four factors are to be used to determine whether the declaration was made under circumstances that provide considerable assurances of reliability by "objective indicia of trustworthiness" rather than used as requirements of admissibility. *Bowel*, 111 Ill. 2d at 67, 488 N.E.2d at 1000, citing *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49.

Just as all four factors are not required to be present to find a statement trustworthy, the existence of one or more of the factors does not make a statement necessarily trustworthy. *People v. Carson*, 238 Ill. App. 3d 457, 463, 606 N.E.2d 363, 367 (1992). Ultimately, it is for the trial court to determine by the totality of the circumstances whether it considers the hearsay statement to be trustworthy. *Carson*, 238 Ill. App. 3d at 463, 606 N.E.2d at 367.

■ Here, it would not have been an abuse of discretion for the trial court to find that the statement did not have considerable assurances of reliability. The statement was not made spontaneously to a close acquaintance shortly after the crime occurred. Rather, the crime occurred in September 1999, and the statement was made a year and a half after the crime in February 2002, to a stranger in jail. With respect to the second factor, the statement does not corroborate defendant's self-defense theory that the gun went off accidentally. While the statement that Moretti convinced Stacy to pull a gun on defendant and to try and scare him with it was corroborated by defendant's testimony that Stacy pulled a gun on him, it does not corroborate defendant's theory that the gun went off accidentally. Moretti makes no indication that he was present or witnessed the gun being discharged. Defendant testified at trial that Moretti was sleeping prior to the shooting and only came out of the room after Stacy was shot. Moretti's statement to Pratt is also inconsistent with the forensics, which indicate multiple shots fired to the back of the head behind the ear at close range.

With respect to the third *Chambers* factor, a declaration against

penal interest is one that would be admissible against the declarant in a criminal prosecution; it need not be a confession, but must involve exposure to criminal liability. 2 J. Strong, McCormick on Evidence § 319(b), at 323-24 (5th ed. 1999). While Moretti's statement to Pratt does implicate him in the concealment of the body, there is nothing in the statement by Moretti implicating him in the murder. With respect to the fourth *Chambers* factor, Moretti was not available for cross-examination by the State as he invoked his fifth amendment right. "Although the general practice is to speak loosely of unavailability of the witness, the critical factor is actually the unavailability of the witness' testimony. Witnesses may be physically present in court but their testimony nevertheless unavailable." 2 J. Strong, McCormick on Evidence § 253, at 127 (5th ed. 1999). A witness' exercise of a privilege satisfies the requirement of unavailability. *People v. Caffey*, 205 Ill. 2d 52, 101, 792 N.E.2d 1163, 1194 (2001). Accordingly, a declarant who asserts his fifth amendment right not to testify is not available for cross-examination in the context of the fourth *Chambers* factor. *Caffey*, 205 Ill. 2d at 101, 792 N.E.2d at 1194. Based upon the totality of the circumstances, it was not an abuse of discretion for the trial court to exclude Pratt from testifying regarding the statements made to him by Moretti.

Accordingly, for all of the foregoing reasons, we reverse defendant's convictions for first-degree murder and concealment of a homicidal death and remand the cause to the circuit court for a new trial. Double jeopardy is not implicated because there is sufficient evidence to prove defendant guilty of both offenses beyond a reasonable doubt. *People v. Fornear*, 176 Ill. 2d 523, 535, 680 N.E.2d 1383, 1389 (1997).

Reversed and remanded.

GREIMAN and QUINN, JJ., concur.