# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Carrilalez*, 2012 IL App (1st) 102687

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE CARRILALEZ, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-10-2687 |
| Filed<br>Rehearing denied | December 21, 2012<br>January 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The direct and circumstantial evidence in a prosecution for first-degree murder and attempted first-degree murder was sufficient to establish defendant's guilt, and the trial court did not abuse its discretion in replacing one of the original jurors with an alternate after the deliberations had begun, since the alternate juror told the trial court that she had not formed an opinion about the case, she had not discussed it with anyone, the trial court instructed the reconstituted jury to begin deliberations anew, and defendant could not use posttrial interviews with the jurors in support of his claims that some jurors did not engage in new deliberations and that the alternate juror had prematurely formed an opinion. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 99-CR-15713; the Hon. Jorge Luis Alonso, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal    Michael J. Pelletier, Alan D. Goldberg, and Tomas G. Gonzalez, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Joan F. Frazier, and Miles J. Keleher, Assistant State's Attorneys, of counsel), for the People.

Panel    JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Justices Rochford and Delort concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial in the circuit court of Cook County, defendant Jose Carrilalez[1] was convicted of one count of first-degree murder and two counts of attempted first-degree murder. Subsequently, he was sentenced to 45 years of imprisonment for the first-degree murder conviction and two concurrent 20-year prison terms for the attempted first-degree murder convictions. On appeal, the defendant argues that: (1) the State failed to prove beyond a reasonable doubt that he was guilty of first-degree murder and attempted first-degree murders; and (2) the trial court abused its discretion when it replaced a juror with an alternate juror after deliberations had begun. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                            BACKGROUND

¶ 3    On June 13, 1999, at approximately 1:45 a.m., Robert Ayala (Robert) was fatally shot near the intersection of Marshfield Avenue and 37th Street in Chicago, Illinois. Thereafter, the defendant and codefendants James Valek (codefendant Valek) and Alfred Martinez (codefendant Martinez) were arrested. On July 14, 1999, the defendant and codefendants Valek and Martinez[2] were charged with first-degree murder, conspiracy to commit murder, attempted first-degree murder, and aggravated discharge of a firearm.

¶ 4    In January 2004, the defendant was convicted in a jury trial of first-degree murder and two counts of attempted first-degree murder. Subsequently, the defendant was sentenced to

---

[1]The defendant's name varies as "Carrilalez," "Carrizalez" and "Carrizales" throughout the record. For consistency, we adopt "Carrilalez" as the defendant's name in this order.

[2]Codefendants Valek and Martinez were tried in separate proceedings and are not part of this appeal.

45 years of imprisonment for first-degree murder, and two concurrent 20-year terms for attempted first-degree murder. On December 1, 2006, this court reversed and remanded the matter for a new trial, holding that the trial court violated the defendant's confrontational rights by admitting into evidence the grand jury testimony of a witness, Patricia Berryman, who had died of natural causes prior to trial. *People v. Carrizalez*, No. 1-04-2196 (2006) (unpublished order under Supreme Court Rule 23).

¶ 5    On March 29, 2010, a jury trial commenced for the retrial of the defendant. The following relevant evidence was adduced at the defendant's retrial. Adrian Vasquez (Adrian) testified for the State that he lived at 3659 South Marshfield Avenue in Chicago. Adrian testified that he was the longtime friend of Robert, the deceased victim, and that Robert lived "[d]own the block" on Marshfield Avenue. On June 12, 1999, between 5 p.m. and 5:30 p.m., Adrian was in front of his house when a mustard yellow, "Al Bundy looking" car drove slowly by his house and then sped away. According to Adrian, it was still daylight at that time and he noticed that the yellow car was driven by a white person, and that the front and rear passenger seats were each occupied by a Hispanic individual. However, Adrian was unable to see the faces of the three individuals in the yellow car. Between 6 p.m. and 7 p.m., Robert arrived at Adrian's home to help clean his basement. Within an hour after Robert's arrival, Adrian saw the yellow car, which carried the same number and races of individuals as he had previously observed, traveling southbound on Ashland Avenue. At approximately 9 p.m., Adrian and Robert finished cleaning Adrian's basement. Adrian then hosted a party in the garage of his residence, which was located in an alley between Marshfield and Ashland Avenues. Between 11 p.m. and 12 a.m., Adrian's neighbor, Juan Rios (Juan), joined the party. Shortly thereafter, Adrian again noticed the yellow car, with three occupants, traveling southbound on Ashland Avenue. On June 13, 1999, at approximately 1:30 a.m., David Mayora (David) arrived as a guest at the party. Adrian testified that shortly after David's arrival, Adrian's car alarm sounded. Adrian's car was parked on the corner of 37th Street and Marshfield Avenue. Adrian, Robert and David then walked to the front of Adrian's home to inspect Adrian's car. After the trio determined that Adrian's car was fine, they started walking eastbound on 37th Street to rejoin the party. At that moment, the yellow car, with its headlights off and with only two occupants–the driver and the rear passenger–stopped at the corner of 37th Street and Marshfield Avenue. Adrian then heard several gunshots, after which he and his friends ran toward his garage for safety. Once Adrian sought shelter in his garage, he noticed that Robert was missing, and he later found Robert lying dead on 37th Street from a bullet wound to the back of his head. As Adrian checked Robert's physical condition, he noticed the yellow car, carrying only the driver and rear Hispanic passenger, drive westbound on 37th Street "at an idle speed just to stop and see what happened." While Adrian waited for the police to arrive, he again noticed the yellow car traveling northbound on Ashland Avenue with only the driver and rear passenger. Adrian testified that the police later took him to the area near 59th and Richmond Streets in Chicago, where he identified a vehicle as the yellow car he had seen before and after the shooting. Adrian further testified that neither he nor Robert belonged to a street gang and that Adrian and his friends did not possess any guns that night.

¶ 6    Juan testified that after midnight on June 13, 1999, he walked from his home on

-3-

Marshfield Avenue to a party held in Adrian's garage. As Juan walked down the alley near Marshfield Avenue, he noticed a "yellowish" car traveling southbound on Ashland Avenue. He testified that the yellow car caught his attention because it "came almost to a stop" at a green traffic light and then "took off." About 10 to 15 minutes after Juan arrived at the party, he saw the yellow car a second time traveling on Ashland Avenue, to which Adrian stated, "[t]here goes that yellow car again." At approximately 1 a.m., Adrian's car alarm sounded in front of Adrian's residence. Subsequently, Adrian, Robert and David exited the garage and walked to Marshfield Avenue, where Adrian's car was parked, while Juan and Adrian's wife stayed in the garage. About five minutes after the trio left to inspect Adrian's car, Juan walked to 37th Street through the alley located between Marshfield and Ashland Avenues to check on his friends. At that point, Juan noticed that the trio was walking back toward him. Juan then saw, on the corner of Marshfield Avenue and 37th Street, a "shadow with his arm extended halfway across the fence" and pointed at the backs of his friends. Before Juan could warn his friends, the "shadow" fired five or six gunshots. Juan testified that the first bullet traveled close to his ear and that the second bullet flew over his head and hit a truck behind him. Juan further stated that neither he, Adrian nor Robert was a member of a street gang and that he and his friends did not display any weapons at the time of the shooting. On cross-examination, Juan testified that he could not see how many occupants were in the yellow car. He further noted that the "shadow" was about 80 feet from him and 40 feet from his friends at the time of the shooting.

¶ 7        Daniel Talavera (Daniel) testified on behalf of the State as to his encounters with the defendant on the night of the shooting. Daniel testified that, in June 1999, he was a member of the street gang Satan Disciples.[3] The Satan Disciples controlled the territory north of 35th Street, while its rival street gang, the Latin Counts, controlled the territory south of 35th Street. On the evening of June 12, 1999 and the early morning hours of June 13, 1999, Daniel was at a nearby park with other Satan Disciples gang members, including the defendant and codefendants Valek and Martinez. Daniel testified that at that time he was a "heavy drinker," and he had consumed 12 to 24 cans of beer and some gin on the night of the shooting. At approximately 1:30 a.m., Daniel and the defendant had a conversation at the park, during which the defendant informed him that he was "going to go south on 35th and see if the clowns were out." Daniel testified that the term "clowns" was a derogatory reference to members of a rival gang, Latin Counts. After this conversation, the defendant walked toward codefendant Valek's car. After the defendant left, Daniel went to a local bar at approximately 2 a.m., where he was later joined by codefendants Valek and Martinez. Daniel testified that the defendant, who was shirtless and looked tired and sweaty, arrived at the bar separately on a 10-speed bicycle, which belonged to a woman named "Pat." Daniel stated that Pat lived at 34th Street and Ashland Avenue and that she stored the bicycle in the hallway of her apartment building. Daniel testified that once the defendant arrived at the bar, the defendant asked codefendant Valek why he did not pick the defendant up at 36th Street and Ashland Avenue. The defendant also stated that he stole the bicycle in order to get to the bar. At

---

[3]The name of Daniel's street gang is referred to as both "Satin" and "Satan" Disciples in the record and parties' briefs.

approximately 4 a.m., the police arrived at the bar and arrested the defendant, codefendant Martinez, and Daniel. Daniel testified that he was never charged with Robert's murder. Although Daniel was convicted of an unrelated felony drug charge in 1999, he was not promised anything in exchange for his testimony. At trial, Daniel identified photographs of a yellow car as codefendant Valek's vehicle–a 1977 Chrysler Plymouth Volare.

¶ 8 Codefendant Valek testified for the State that, in January 2004, he pled guilty to conspiracy to commit first-degree murder of Robert and to two counts of attempted murder of Adrian and Juan. As a result of the guilty plea, codefendant Valek was sentenced to 22 years of imprisonment. Codefendant Valek testified that in June 1999, he was a member of the Satan Disciples gang, that he frequented a park near 33rd Street and Ashland Avenue, and that he owned a "yellow or beige" Plymouth Volare, which he positively identified in several photographs at trial. In the evening of June 12, 1999 and the early morning of June 13, 1999, he and other Satan Disciples members, including the defendant, went to Lake Michigan and the park. While at the park, at approximately 12:30 a.m., the defendant stated, "let's go see if the clowns are out," which codefendant Valek interpreted to mean "we were going to go over there and beat them up or either going to shoot them, shoot at them." Codefendant Valek, codefendant Martinez and the defendant then entered codefendant Valek's car. Codefendant Valek testified that he was Caucasian and was the driver of the car, that the defendant was Mexican and sat in the front passenger seat, and that codefendant Martinez was Mexican and rode in the backseat. They then drove into Latin Counts territory to the area of 37th Street and Marshfield Avenue, where codefendant Valek slowed the speed of the car and the defendant reached across the driver's side and turned off the headlights. At some point, the defendant exited the car and codefendant Valek saw the defendant carrying a "flash of a gun." After the defendant exited the car, codefendants Valek and Martinez argued over whether they should pick the defendant up in the car. Codefendant Martinez was in favor of retrieving the defendant at a rendezvous point on 36th Street, while codefendant Valek refused to do so for fear of being connected to the shooting. Codefendant Valek then drove around the block to 37th Street and Ashland Avenue, where he observed "four or five guys" yelling and displaying gang signs," and he heard several gunshots. Following the shooting, codefendants Valek and Martinez went to a local bar where they met with Daniel. Codefendant Valek then drove home to 5955 South Richmond Street, where he switched cars and returned to the bar in Daniel's car at approximately 2:15 a.m. Codefendant Valek testified that he switched cars because he was "scared that somebody saw [his] car on the scene" and that he would be identified by his car. After codefendant Valek returned to the bar, the defendant, who was shirtless and sweating heavily, arrived on a bicycle. The defendant then argued with codefendant Valek about why he did not pick the defendant up in the car, to which codefendant Valek explained, "I wasn't going to pick him up because somebody was shot and laying on the floor, I'm not going to get caught for somebody that is dead." Subsequently, the police arrived at the bar and arrested the defendant, codefendant Martinez and Daniel. Codefendant Valek was arrested later at his home, and he initially told the police that he knew nothing about the shooting. However, he subsequently admitted to the police in a handwritten statement that he was the driver of the car, that the defendant held a revolver in his hand when he exited the car, and that the defendant stated "I'm going to do

it" prior to the shooting. At trial, codefendant Valek identified several photographs of an apartment building located at 33rd Street and Ashland Avenue, where Patricia Berryman lived, and testified that fellow gang members used the building's vacant second-floor unit as a "party house." Codefendant Valek further testified that, prior to the defendant's trial, he wrote a letter to the prosecutor in an attempt to reduce his sentence. However, the prosecutor informed codefendant Valek that nothing could be done about his sentence. Codefendant Valek testified that he was not given any consideration in exchange for his trial testimony against the defendant.

¶ 9    Sergeant James Ballauer (Sergeant Ballauer) testified that on June 13, 1999, at approximately 1:45 a.m., he and his partner responded to the scene of the shooting, where Robert lay dead on a sidewalk. Sergeant Ballauer spoke with Adrian, who provided a description of the yellow car. Sergeant Ballauer then issued a radio "flash message" to other police officers about the description of the suspect's vehicle. Thereafter, Sergeant Ballauer spoke with a woman named Patricia Berryman at her residence at 3358 South Ashland Avenue. Sergeant Ballauer later recovered a woman's 10-speed bicycle near the bar where the defendant was arrested.

¶ 10    Officer Terrence Johnson (Officer Johnson) testified that on June 13, 1999, at about 1:45 a.m., he responded to Sergeant Ballauer's radio "flash message" and recognized the car description as one that matched a vehicle he had stopped two weeks prior to the shooting. During the previous traffic stop, Officer Johnson filled out a "contact card" which listed all of the occupants of the yellow car–including that codefendant Valek was the driver and registrant of the vehicle. Officer Johnson shared this information with his fellow officers at the scene of the shooting. He and Adrian then traveled to codefendant Valek's home at 5955 South Richmond Street, where they located the yellow car. Upon seeing the yellow car, Officer Johnson recognized it as the same vehicle he had encountered during the traffic stop, put his hand on the car's engine, and noted that it was warm. Adrian then positively identified the yellow car as the vehicle he had observed fleeing the scene of the shooting. At approximately 4 a.m., Officer Johnson visited the local bar to locate codefendant Valek. At the bar, he arrested the defendant, codefendant Martinez and Daniel. Officer Johnson further testified that the arrest report listed the defendant's occupation as an automobile mechanic.

¶ 11    Forensic investigator Joseph Bembynista (Investigator Bembynista) testified that he processed the crime scene shortly after the shooting. He found a bullet hole in the rain gutter of a building located at 1616 West 37th Street, found bullet damage to a parked truck located east of Robert's body, and recovered a fired bullet in the alley. Investigator Bembynista believed that the shooter used a revolver rather than a semiautomatic weapon because no shell casings were found. He did not recover any latent fingerprints from the yellow car.

¶ 12    Wah Chu (Chu) testified that he owned the apartment building located at 3358 South Ashland Avenue. In June 1999, Patricia Berryman was the tenant of one of the two second-floor units in the building, while the other second-floor unit was vacant. Chu testified that he had encountered problems with people entering the vacant unit without permission. He further stated that Patricia Berryman sometimes stored her bicycle in the entranceway on the first floor of the building.

¶ 13    Retired police forensic investigator Daniel Principato (Investigator Principato) testified that on June 13, 1999, at about 7:35 a.m., he administered a gunshot residue test to the defendant's hands. When Investigator Principato asked the defendant about his occupation and hobbies, the defendant replied that he was a "maintenance man" who restored cars. About 10 minutes later, Investigator Principato administered a gunshot residue test to codefendant Valek's hands. At approximately 8:30 a.m., Investigator Principato received a fired bullet in a sealed envelope from the medical examiner's office. The fired bullet had been extracted from Robert's body during autopsy. On June 14, 1999, Investigator Principato traveled to Chu's two-story apartment building located at 3358 South Ashland Avenue and recovered a revolver hidden inside a space heater in the vacant apartment unit. The revolver's cylinder contained six fired cartridge cases, but no unfired bullets. The cartridge cases were then inventoried and sent to a crime lab for testing. Investigator Principato explained that no fingerprints were found on the space heater because it had a "bumpy" surface, and that the revolver was not dusted for fingerprints.

¶ 14    Trace evidence analyst Robert Berk (Analyst Berk) testified that he analyzed the gunshot residue tests of the defendant's and codefendant Valek's hands. He explained that a primer contained in a cartridge case of a firearm usually consists of lead, barium and antimony. When the firearm is discharged, clouds of smoke consisting of lead, barium and antimony are deposited onto the hands and clothing of the person who discharged the weapon. He opined, based on a reasonable degree of scientific certainty, that the defendant's gunshot residue test results "were positive for the sample that was taken from his right hand back, his right hand palm, and also his left hand palm." He further opined that codefendant Valek's right palm tested positive for gunshot residues. No gunshot residue testing was performed for the samples taken from codefendant Valek's left hand because the test tube had cracked during the testing process. The levels of barium and antimony on the defendant's hands were higher than the levels of those same elements found on codefendant Valek's hand. Analyst Berk stated that any positive test results were consistent with the individual having discharged, handled, or been in close proximity to a firearm when it was discharged. However, on cross-examination, he explained that trace amounts of lead, barium and antimony could be found on anyone's hands as a result of daily contact with the environment. These elements could also be elevated in individuals, such as automobile mechanics, whose occupation require that they come into contact with automotive parts that contain these elements. On redirect examination, Analyst Berk further explained that it is possible for a person with gunshot residue on his hands to transfer it to another person with whom he comes into contact.

¶ 15    The parties then stipulated at trial that Dr. James Filkins (Dr. Filkins) performed the autopsy on Robert's body and observed a gunshot wound in the back of his head. Dr. Filkins recovered a "deformed medium caliber" bullet from the left side of Robert's scalp. Dr. Filkins would testify to a reasonable degree of medical certainty that Robert died of the gunshot wound to his head and that the manner of death was homicide.

¶ 16    Christopher Kalkowski (Kalkowski), a firearms expert, testified that he examined the revolver, two fired bullets and six cartridge cases in connection with Robert's murder. Kalkowski performed test firing of the revolver and opined to a reasonable degree of

scientific certainty that the two fired bullets were fired from the recovered revolver, "to the exclusion of all other firearms." However, Kalkowski was unable to eliminate the six cartridge cases as being fired from the revolver.

¶ 17    Following Kalkowski's testimony, the State rested. The trial court then denied the defendant's motion for a directed finding.

¶ 18    The defense presented the testimony of Yahya Maatah (Yahya), who owned an automobile body shop located at 3689 Grand Avenue in Chicago. Yahya testified that in June 1999, the defendant was employed as a mechanic at the body shop. The defendant's job duties included repairing and delivering cars, changing car parts, and cleaning.

¶ 19    On April 1, 2010, at approximately 11:20 a.m., jury deliberations commenced. Prior to allowing the alternate jurors to leave the courthouse when the jury began deliberations, the trial judge informed the alternate jurors that they were released from the courthouse but not discharged from jury service. The court then instructed them to refrain from discussing the case with anyone or forming an opinion even after leaving the premises. At approximately 2:50 p.m., a jury note was sent to the trial judge which read: "Judge, we have a question. One of our jurors had a problem understanding what is going on in court and is needing help to understand what would be a course of action?" The jury foreperson, Foreperson Lavergne, was called out to the courtroom, where she informed the court that Juror Chacon had a "language barrier" problem. Before Foreperson Lavergne returned to the jury room, the trial court instructed her that "if we call out [Juror] Chacon, please stop deliberating at that point." The parties then agreed that the trial court should question Juror Chacon. At that point, the trial court remarked, "[a]ll right. Let's bring out [Juror] Chacon, please. And tell every [*sic*] everyone else to stop deliberating." Thereafter, Juror Chacon was brought into the courtroom and informed the trial court that her first language was Spanish and that she could not understand all of the case nor render a decision due to a "language problem." The parties agreed that Juror Chacon should be excused and that the first alternate juror (Juror Boone) should replace her. The trial court then excused Juror Chacon and instructed the deputy sheriff to contact Juror Boone, who had already left the premises, and stated "[t]ell the jury to stop deliberating and wait for the [alternate] juror to show up."

¶ 20    At approximately 5:05 p.m., Juror Boone returned to the courthouse. Defense counsel moved for a mistrial, arguing that prejudice would result if an alternate juror were brought in after the original jurors had already deliberated for about 3½ hours. Defense counsel further argued that the trial court had only instructed the deputy sheriff to tell the remaining 11 jurors to stop deliberating, as opposed to admonishing the jury as a group on the record. The State countered that the defendant was not prejudiced and that it was within the trial court's discretion to replace Juror Chacon with Juror Boone. The trial court denied the defendant's motion for a mistrial. The trial court then questioned Juror Boone, who stated that she had followed the court's instructions and had not discussed the case with anyone, had not formed any opinions about the case, and had not received any "outside influences" regarding the case. Subsequently, the newly reconstituted jury, including Juror Boone, was brought into the courtroom where the trial court instructed the jurors to begin deliberations anew. At approximately 5:39 p.m., the reconstituted jury began deliberations. At approximately 7:10 p.m., the jury reached a verdict and found the defendant guilty of first-

degree murder of Robert and guilty of attempted first-degree murders of Adrian and Juan.

¶ 21    On August 10, 2010, the defendant filed a motion for a new trial. On August 11, 2010, the trial court denied the motion for a new trial. Subsequently, the trial court sentenced the defendant to the same sentence rendered in the defendant's first jury trial–45 years of imprisonment for the murder of Robert and two concurrent 20-year terms for the attempted murders of Adrian and Juan.

¶ 22    On August 30, 2010, the defendant filed a notice of appeal before this court.

¶ 23                                    ANALYSIS

¶ 24    We determine the following issues on appeal: (1) whether the State proved beyond a reasonable doubt that the defendant was guilty of first-degree murder and attempted first-degree murder; and (2) whether the trial court abused its discretion in replacing an original juror with an alternate juror after deliberations had begun.

¶ 25    We first determine whether the State proved beyond a reasonable doubt that the defendant was guilty of first-degree murder and attempted first-degree murders.

¶ 26    The defendant argues that the evidence was insufficient to support his convictions. Specifically, he contends that his convictions were secured primarily on the untrustworthy testimony of codefendant Valek, who had an obvious motive to lie and whose testimony was inherently suspect, weak and inconsistent with other trial evidence. The defendant further maintains that, beyond codefendant Valek's suspect testimony, the State "presented nothing more than an incoherent patchwork of circumstantial evidence," that no rational jury could find Daniel's perception and recollection of the events to not have been impaired by Daniel's alcohol consumption, and that there was no physical evidence to link the defendant to the crime scene, the vacant apartment, or the murder weapon.

¶ 27    The State counters that both direct and circumstantial evidence at trial established the defendant's guilt beyond a reasonable doubt, noting that it was within the province of the jury to determine the credibility of and the weight to be given to codefendant Valek's and Daniel's testimony.

¶ 28    When the sufficiency of the evidence is challenged on appeal, we must determine " 'whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Graham*, 392 Ill. App. 3d 1001, 1008-09, 910 N.E.2d 1263, 1271 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court affords great deference to the trier of fact and does not retry the defendant on appeal. *People v. Smith*, 318 Ill. App. 3d 64, 73, 740 N.E.2d 1210, 1217 (2000). It is within the province of the trier of fact "to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence." *Graham*, 392 Ill. App. 3d at 1009, 910 N.E.2d at 1272. A reviewing court will not substitute its judgment for that of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242, 860 N.E.2d 178, 217 (2006). A criminal conviction will not be reversed "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt." *Graham*, 392 Ill. App. 3d at 1009, 910 N.E.2d at 1271.

¶ 29    "A person who kills an individual without lawful justification commits first[-]degree murder if, in performing the acts which cause the death: *** (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another ***." 720 ILCS 5/9-1(a)(2) (West 2010). A person commits attempted first-degree murder when he, with the intent to commit murder, "does any act that constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2010).

¶ 30    Viewing the evidence in the light most favorable to the State, we find that the State proved beyond a reasonable doubt that the defendant was guilty of the first-degree murder of Robert and attempted first-degree murders of Adrian and Juan. The jury heard Adrian's testimony that he repeatedly observed a yellow car, which was later identified as codefendant Valek's vehicle, traveling with three occupants in his neighborhood on the night of the shooting. Adrian testified that the three occupants consisted of a white driver, a Hispanic front passenger and a Hispanic rear passenger. Adrian testified that immediately before and after the shooting, the Hispanic individual in the front passenger seat was missing from the vehicle. The jury also heard testimony from Juan that he noticed, on the corner of Marshfield Avenue and 37th Street, a "shadow" firing five or six gunshots at Robert, Adrian and David, that a bullet traveled close to Juan's ear, and that another bullet flew over Juan's head and hit a truck behind him. Neither Robert, Juan nor Adrian was armed at the time of the shooting. Evidence was presented to the jury that Investigator Bembynista, who processed the crime scene shortly after the shooting, recovered a fired bullet in the alley and found bullet damage to a parked truck and a nearby rain gutter. The jury further heard testimony that the defendant, while at a nearby park with fellow Satan Disciples gang members, remarked that he was going to see if the "clowns were out," which the jury could reasonably interpret to mean that the defendant was looking to shoot at rival gang members. The jury also heard codefendant Valek's testimony specifying the defendant's participation in the shooting, including testimony that the defendant, a Hispanic individual, was a front passenger in codefendant Valek's car; that the defendant carried a gun as he exited the car in the area of 37th Street and Marshfield Avenue; that codefendant Valek heard gunshots after the defendant exited the vehicle; that codefendant Valek refused to retrieve the defendant at a rendezvous point on 36th Street for fear that he would be implicated in the shooting; and that the defendant later arrived at a local bar on a bicycle. Evidence was also presented to the jury that the bicycle belonged to a woman named Patricia Berryman, whose apartment unit at 3358 South Ashland Avenue was located next to a vacant apartment that the Satan Disciples used as a "party house" and where Investigator Principato recovered the murder weapon. The jury also heard testimony that the defendant's hands tested positive for gunshot residue and that the two fired bullets recovered by the police matched the revolver which was found hidden in the vacant apartment unit at 3358 South Ashland Avenue. Based on this evidence, the jury could reasonably infer that the defendant was armed as he traveled in codefendant Valek's car to the area of 37th Street and Marshfield Avenue; that he exited the car and was the "shadow" whom Juan observed on the corner of Marshfield Avenue and 37th Street firing shots in an attempt to kill Adrian and Juan and which killed Robert without any lawful justification; that he hid the gun in the heater of the vacant apartment unit at 3358 South Ashland Avenue after the shooting; and that he rode Patricia Berryman's bicycle to

-10-

meet with other Satan Disciples members at the local bar because codefendant Valek refused to retrieve him from a rendezvous point on 36th Street. Thus, we find that the evidence, when viewed in the light most favorable to the State, was sufficient to establish beyond a reasonable doubt that the defendant committed the offenses of first-degree murder of Robert and attempted first-degree murders of Adrian and Juan. See *People v. Bannister*, 378 Ill. App. 3d 19, 39, 880 N.E.2d 607, 625 (2007) ("[t]he testimony of a single witness is sufficient to convict if the testimony is positive and the witness is credible").

¶ 31    The defendant, in urging this court to reverse his convictions, argues that codefendant Valek's testimony implicating the defendant was inherently suspect and weak because he had a motive to lie. Specifically, he contends that codefendant Valek's testimony should be viewed with skepticism because he was culpable for the shooting.

¶ 32    While the testimony of an accomplice witness has inherent weaknesses and should only be accepted with caution and suspicion, such testimony, " 'whether corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the [trier of fact] of the defendant's guilt beyond a reasonable doubt.' " *Id.* at 40, 880 N.E.2d at 625-26 (quoting *People v. Tenney*, 205 Ill. 2d 411, 429, 793 N.E.2d 571, 583 (2002)). Moreover, "a conviction will not be reversed simply because the defendant claims that a witness was not credible." *Id.*, 880 N.E.2d at 626.

¶ 33    In this case, the direct evidence implicating the defendant for the shooting consisted primarily of the testimony of codefendant Valek, who provided the jury with specific details regarding his own involvement and that of the defendant in the murder of Robert and attempted murders of Adrian and Juan. Codefendant Valek testified to the events leading up to the shooting, the car ride to the area of 37th Street and Marshfield Avenue, the defendant's possession of a gun as he exited codefendant Valek's car, and codefendant Valek's refusal to pick the defendant up at a rendezvous location after gunshots were fired. He also described the events following the shooting, including that he and codefendant Martinez went to a local bar, where the defendant later arrived on a bicycle and quarreled with codefendant Valek about why he did not retrieve the defendant after the shooting. The jury heard evidence that, in January 2004, codefendant Valek had pled guilty to conspiracy to commit the first-degree murder of Robert and to two counts of attempted murder of Adrian and Juan, and that he was sentenced to 22 years of imprisonment. Evidence was also presented to the jury that, prior to the defendant's trial, codefendant Valek wrote a letter to the prosecutor in an attempt to reduce his sentence, but that the prosecutor informed him that nothing could be done about codefendant Valek's sentence. The jury also heard testimony that codefendant was not given any consideration in exchange for his trial testimony against the defendant. Our review of the record further shows that the trial court also instructed the jury that the testimony of an accomplice "is subject to suspicion and should be considered by you with caution." Based on this evidence, the jury, as the trier of fact, was in the position to determine the credibility of codefendant Valek and to determine the appropriate weight to afford his testimony. See *Graham*, 392 Ill. App. 3d at 1009, 910 N.E.2d at 1272. We decline to substitute our judgment for that of the trier of fact. Moreover, several aspects of codefendant Valek's testimony were corroborated by the testimony of Daniel and Adrian. In particular, Daniel's testimony corroborated the description of the events that occurred before and after the

-11-

shooting. Adrian's testimony regarding the yellow car, and the number and racial makeup of the occupants of the yellow car, corroborated codefendant Valek's testimony.

¶ 34    The defendant further challenges codefendant Valek's testimony by arguing that it was inconsistent with other trial evidence. Specifically, he argues that the elevated levels of lead, barium and antimony that were found on codefendant Valek's right hand could not be explained and that the positive gunshot residue test result was inconsistent with codefendant Valek's testimony that he did not rendezvous with the defendant until later at the local bar. The defendant posits that, based on these discrepancies, it was "just as likely" that codefendant Valek was the lone shooter who hid the gun in the vacant apartment.

¶ 35    We reject the defendant's speculative arguments and decline to invade the jury's role as the trier of fact to resolve conflicts or inconsistencies in the evidence. See *Graham*, 392 Ill. App. 3d at 1009, 910 N.E.2d at 1272. Further, the defendant's argument would require us to accept that a series of coincidences just happened to occur during this time period and those coincidences erroneously point to him as the shooter. We reject the defendant's reasoning and argument. The jury heard Analyst Berk's testimony that the defendant's hands tested positive for gunshot residue and that levels of barium and antimony on the defendant's hands were higher than the levels of those same elements found on codefendant Valek's hand. Analyst Berk further opined that positive test results for gunshot residue were consistent with the individual having discharged, handled, or been in close proximity to a firearm when it was discharged, but acknowledged that trace amounts of lead, barium and antimony could be found on anyone's hands as a result of daily contact with the environment. Analyst Berk explained that it is also possible for a person with gunshot residue on his hands to transfer it to another person with whom he comes into contact. Based on this evidence, the jury could reasonably find that the defendant discharged the firearm that killed Robert and could reasonably infer that codefendant Valek tested positive for gunshot residue as a result of coming into contact with the defendant at the local bar after the shooting. Although Analyst Berk testified that automobile mechanics, such as the defendant, were required to come into contact with automotive parts that contain these elements, the defendant's convictions cannot be reversed on this basis where, viewing all of the evidence in a light most favorable to the State, the essential elements of the crime were proven beyond a reasonable doubt. See *People v. Wheeler*, 226 Ill. 2d 92, 117, 871 N.E.2d 728, 742 (2007) (the trier of fact is not required "to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt" (internal quotation marks omitted)). Moreover, regardless of whether the gunshot residue on codefendant Valek could be explained, this did not absolve the defendant of responsibility for his actions.

¶ 36    The defendant further challenges Daniel's testimony by arguing that no rational jury could find that Daniel's perception and recollection of the events were not significantly impaired by his alcohol consumption. As discussed, we decline to substitute our judgment for that of the jury in determining the credibility of trial witnesses. Here, the jury heard Daniel's testimony that he was a "heavy drinker" and that he had consumed 12 to 24 cans of beer and some gin on the night of the shooting. Based on this evidence, the jury was fully equipped to assess Daniel's credibility and to determine the appropriate weight to give his testimony regarding the events on the night of the shooting. Further, we find that, even apart

from Daniel's testimony, the evidence presented at trial was sufficient to establish the defendant's guilt beyond a reasonable doubt.

¶ 37      The defendant also makes a number of other arguments attacking the sufficiency of the evidence, including that there was no physical evidence linking him to the crime scene, the vacant apartment, or the murder weapon. He further maintains that, beyond codefendant Valek's testimony, the State presented only circumstantial evidence. We reject these arguments as they are primarily designed to urge this court to disregard codefendant Valek's testimony, which directly implicated the defendant as the shooter. As discussed, we decline to engage in credibility determinations of trial witnesses, and we find that codefendant Valek's testimony was sufficient to convict the defendant. See *Bannister*, 378 Ill. App. 3d at 39, 880 N.E.2d at 625 ("[t]he testimony of a single witness is sufficient to convict if the testimony is positive and the witness is credible"). Just because the defendant claims that codefendant Valek was not credible does not warrant a reversal of his convictions. *Id.* at 40, 880 N.E.2d at 626 ("a conviction will not be reversed simply because the defendant claims that a witness was not credible"). Based on our review of the record, we cannot say that the evidence was so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. As discussed, the direct and circumstantial evidence, when viewed in a light most favorable to the State, was sufficient for the jury to establish the defendant's guilt. Therefore, the State proved beyond a reasonable doubt that the defendant was guilty of the first-degree murder of Robert and the attempted first-degree murders of Adrian and Juan.

¶ 38      We next determine whether the trial court abused its discretion in replacing an original juror with an alternate juror after deliberations had begun.

¶ 39      The defendant argues that he was denied his right to a fair and impartial trial when the trial court abused its discretion in replacing Juror Chacon with Juror Boone after jury deliberations had begun. He contends that while the trial court "directed someone" to tell the original jury to stop deliberating, the record does not reveal to whom that directive was made. He argues that the trial court did not instruct the remaining 11 original jurors as a group before the reconstituted jury began deliberating, and that there was a "real possibility" that the 11 original jurors continued deliberations for about 2 1/2 hours and formed opinions about the case before Juror Boone returned to the courthouse. Further, the defendant posits that the trial court erroneously found that evidence presented in the defendant's motion for a new trial was an improper attempt by the defense to delve into the jury's deliberative process and to impeach the jury verdict.

¶ 40      The State argues that the trial court properly exercised its discretion in replacing Juror Chacon with Juror Boone, and that the defendant suffered no prejudice as a result of the replacement. Specifically, the State maintains that Juror Boone was subjected to the same selection procedures as other jurors; that she took the same oath as other jurors; that the trial court had the opportunity to question and establish her impartiality before permitting her to replace Juror Chacon; that Juror Boone had not discussed the case with anyone nor formed any opinions about the case prior to replacing Juror Chacon; that the reconstituted jury was instructed to begin deliberations anew; and that the record contains no indication that Juror Boone was unable to render a fair decision.

¶ 41    "Matters relating to jury selection and management are generally within the discretion of the trial court." *People v. Roberts*, 214 Ill. 2d 106, 121, 824 N.E.2d 250, 259 (2005). Our supreme court has determined that, under Illinois law, there is no general bar prohibiting the use of alternate jurors after the case has been submitted to the jury and deliberations have commenced. See *id.* at 119, 824 N.E.2d at 257.

¶ 42    In *Hayes*, during deliberations, a juror indicated that he could not understand English very well and had difficulty following the testimony. *People v. Hayes*, 319 Ill. App. 3d 810, 811, 745 N.E.2d 31, 34 (2001). The trial court then replaced the juror with an alternate juror who had already been discharged 2 1/2 hours earlier. *Id.* at 814, 745 N.E.2d at 36. Upon returning to the courthouse, the alternate juror informed the trial court that he had not spoken with anyone about the case and had not formed an opinion. *Id.* The trial court then instructed the newly reconstituted jury to begin deliberations anew, and the reconstituted jury convicted the defendant of the charged offenses. *Id.* On appeal, the defendant argued that the trial court erred in dismissing and replacing the juror, rather than declaring a mistrial. *Id.* at 815, 745 N.E.2d at 37. In affirming the defendant's convictions, the *Hayes* court held that the trial court's replacement of the juror during deliberations did not require reversal because the defendant was not prejudiced by the procedure. *Id.* at 817, 745 N.E.2d at 38. The *Hayes* court specifically found that the alternate juror was subject to the same selection procedures as the other jurors; that he took the same oath as the other jurors; that he heard the evidence and was instructed on the law; that he was discharged for a fairly short amount of time before being recalled; that he informed the trial court that he had not discussed the case with anyone since being discharged nor had he formed any opinions about the case; that the jury was admonished to begin deliberations anew to allow the replacement juror to participate; and that the record contained no indication that he was unwilling or unable to render a fair decision. *Id.* at 817-18, 745 N.E.2d at 38-39 (citing *People v. Henderson*, 45 Ill. App. 3d 798, 359 N.E.2d 909 (1977) (holding that the replacement of a juror after deliberations did not prejudice the defendant)). We find *Hayes* instructive on this issue.

¶ 43    Like *Hayes*, after deliberations began in the case at bar, Juror Chacon informed the trial court that her first language was Spanish and that she had a "language problem" that prevented her from understanding all of the case and from rendering a decision. Alternate Juror Boone, who had left the premises, was then summoned back to the courthouse. Upon her arrival, Juror Boone informed the trial court that she had followed the court's instructions and had not discussed the case with anyone, had not formed any opinions about the case, and had not received any "outside influences" regarding the case. The trial court then replaced Juror Chacon with Juror Boone, and the newly reconstituted jury was instructed by the trial court to begin deliberations anew. Similar to the alternate juror in *Hayes*, Juror Boone was subject to the same jury selection procedures as the original jurors and had taken the same oath as the other jurors. The record also shows that Juror Boone, along with the original jurors, had heard the evidence and was instructed on the law. Thus, we find that, like the alternate juror in *Hayes*, Juror Boone was not a stranger to the proceedings and the record contains no indication that she was unwilling or unable to render a fair decision.

¶ 44    In determining whether the trial court abused its discretion in replacing a juror with an alternate juror, "the primary consideration must be the potential prejudice to the defendant

-14-

as a result of the postsubmission replacement." *Roberts*, 214 Ill. 2d at 121, 824 N.E.2d at 259. In determining whether a defendant was prejudiced, a reviewing court will consider the totality of the circumstances, including: "(1) whether the alternate juror and the remaining original jurors were exposed to outside prejudicial influences about the case; (2) whether the original jurors had formed opinions about the case in the absence of the alternate juror; (3) whether the reconstituted jury was instructed to begin deliberations anew; (4) whether there is any indication that the jury failed to follow the court's instructions; and (5) the length of deliberations both before and after the substitution." *Id.* at 124, 824 N.E.2d at 260 (finding *Hayes* and *Henderson* instructive in analyzing the potential prejudice to a defendant as a result of postsubmission jury replacement). Having examined each of the five factors outlined in *Roberts* in order to determine if the defendant is prejudiced, we conclude that the defendant was not prejudiced by the substitution of Juror Chacon by Juror Boone.

¶ 45    The defendant acknowledges that, upon returning to the courthouse, Juror Boone had informed the trial court that she had neither formed an opinion about the case nor discussed it with anyone, and that the trial court instructed the reconstituted jury to begin deliberations anew. However, he argues that the "record refutes [J]uror Boone's claim that she had not formed an opinion." In support of this argument, the defendant notes that interviews conducted by defense counsel of Juror Boone and several other jurors *after* the verdict had been rendered indicated that some of the jurors had prematurely made up their minds and failed to engage in new deliberations as a reconstituted jury.

¶ 46    Generally, "a jury verdict may not be impeached by the testimony of the jurors." *People v. Hobley*, 182 Ill. 2d 404, 457, 696 N.E.2d 313, 339 (1998). "It is well settled that a statement by a juror taken after the jury has rendered its verdict, has been polled in open court, and has been discharged will not be admitted to impeach the jury's verdict." *Id.* "This rule prevents the admission of a juror's affidavit to show 'motive, method or process by which the jury reached its verdict.' " *Id.* (quoting *People v. Holmes*, 69 Ill. 2d 507, 511, 372 N.E.2d 656, 658 (1978)). Public policy considerations underlying this rule include protecting the jurors from harassment by a defeated party, and preserving the integrity of the private deliberative process. *Hobley*, 182 Ill. 2d at 457, 696 N.E.2d at 339. "The rule against admitting juror testimony to impeach a verdict does not, however, preclude juror testimony or affidavits which are offered as proof of improper extraneous influences on the jury." *Id.* at 457-58, 696 N.E.2d at 339.

¶ 47    In the instant case, the jury found the defendant guilty of first-degree murder and attempted first-degree murders. The record reveals that the jury was polled in open court, with each juror affirming that the guilty verdict was correct. We find that the results of the juror interviews, which were conducted by defense counsel after the verdict had been rendered, could not be used to impeach the jury's verdict. As the trial court correctly noted in denying the defendant's motion for a new trial, the juror interviews "all go to the deliberative process that the jury was undertaking in the jury room" and that there was no evidence of any improper extraneous influences on the jury. Thus, the defendant's claim that Juror Boone had prematurely formed an opinion prior to returning to the courthouse must fail.

¶ 48    For the same reason, we reject the defendant's argument that there was a "real

possibility" that the 11 original jurors continued deliberations for about another 2 1/2 hours and formed opinions about the case before Juror Boone returned to the courthouse. As discussed, the jury interviews conducted by defense counsel could not be used to impeach the jury's verdict. Moreover, the record shows that the trial court repeatedly stated that the jury must stop deliberating in the absence of Juror Chacon or Juror Boone. First, the trial court specifically instructed Foreperson Lavergne, who had explained the nature of the jury note to the trial court, that "if we call out [Juror] Chacon, please stop deliberating at that point." After the parties agreed that the trial court should question Juror Chacon, the trial court remarked, "[a]ll right. Let's bring out [Juror] Chacon, please. And tell everyone to stop deliberating." Later, after excusing Juror Chacon, the trial court instructed the deputy sheriff to contact Juror Boone and stated,"[t]ell the jury to stop deliberating and wait for the juror to show up." There is nothing in the record to suggest that either Foreperson Lavergne or the deputy sheriff failed to follow the trial court's direction to stop all jury deliberation, or that the 11 original jurors improperly continued to deliberate or formed opinions about the case before Juror Boone joined them. Thus, we find the defendant's argument on this basis to be without merit.

¶ 49    The defendant further speculates that the reconstituted jury failed to follow the trial court's instruction to begin deliberations anew, as evidenced by the fact that the original jury members deliberated for 3 1/2 hours before the jury note was sent to the trial judge, whereas the reconstituted jury reached a verdict after only about 1 1/2 hours of deliberation. We find this argument to be purely speculative. The fact that the reconstituted jury reached a verdict after a shorter length of time than that of the original jury's initial deliberations in no way established that the reconstituted jury disobeyed the trial court's instructions to begin deliberations anew. See *People v. Taylor*, 166 Ill. 2d 414, 438, 655 N.E.2d 901, 913 (1995) (the jury is presumed to follow the instructions given by the court); *People v. Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 65 (same). It is just as likely that the original jury's initial deliberations took longer because the jurors encountered difficulty with Juror Chacon's language barrier. There is nothing in the record to indicate that the trial court's directives and orders were disregarded by the jurors. We decline to engage in speculation regarding how the jury deliberated. Thus, we find that the defendant suffered no prejudice and was not deprived of a fair trial. Therefore, we hold that the trial court did not abuse its discretion in replacing Juror Chacon with Juror Boone after jury deliberations commenced. The trial judge instituted the use of the alternate juror exactly as the process was intended to be used.

¶ 50    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 51    Affirmed.