NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200333-U

NO. 4-20-0333

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 15, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Pike County |
| CHARLES T. ALLEN, | ) | No. 19CF55 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Frank McCartney, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Defendant has not shown his right to a unanimous jury verdict was denied when the trial court dismissed a juror after the case was submitted to the jury.

(2) Defendant, by not including a video recording of a witness statement in the record, failed to establish reversible error in the trial court's denial of defendant's request to admit that evidence.

(3) Defendant's sentence was not excessive.

¶ 2    In January 2020, a jury found defendant, Charles T. Allen, guilty of the first degree murder of his former father-in-law, Donald J. Collard (720 ILCS 5/9-1(a)(1), (2) (West 2018)). He was sentenced to 44 years' imprisonment. Defendant appeals his conviction and sentence, arguing (1) the trial court erred when it dismissed a juror who, after deliberations began, informed the court she could not for religious reasons judge the defendant; (2) the court erred by not admitting a video recording of a witness's statement after the witness invoked her right against self-incrimination and refused to testify on defendant's behalf; and (3) his sentence

was excessive. We affirm.

¶ 1                                     I. BACKGROUND

¶ 2          On March 26, 2019, Donald suffered multiple stab wounds after encountering defendant outside of his own residence. The following day, the State charged defendant with three counts: (1) first degree murder, in that defendant stabbed Donald (born June 21, 1953) multiple times in the chest with the intent to do great bodily harm (720 ILCS 5/9-1(a)(1) (West 2018)); (2) first degree murder, in that defendant stabbed Donald knowing that the act created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2018)); and (3) aggravated battery (720 ILCS 5/12-3.05(a)(4) (West 2018)). The State dismissed the aggravated battery count, and a jury trial proceeded on the first degree murder charges.

¶ 3                                     A. *Voir Dire*

¶ 4          A group of 24 potential jurors was called for questioning. This group contained Mary Davis. During *voir dire*, the trial court asked the group the following: "Is there any reason, moral, philosophical, religious reason known only to you, other than what you told me so far, that you could not be a fair and impartial juror in this case?" All answered in the negative. The record establishes the State further questioned a panel of potential jurors, "And no religious or moral beliefs that would keep you from judging another human being?" To that question, the record notes a "[n]egative response from the back row." The back row included Davis. Davis was placed on the jury.

¶ 5                                     B. Evidence at Trial

¶ 6          At trial, defendant admitted stabbing Donald but argued, alternatively, the stabbing was justified as self-defense or he was guilty of second degree murder as he believed, albeit unreasonably, the use of deadly force was necessary.

- 2 -

¶ 7    The State first called Zack Orr, chief deputy of the Pike County Sheriff's Department and the chief of police for the Pleasant Hill Police Department. Chief Orr testified Donald was married to Denise Collard. Donald and Denise had three children. One of their children was Melissa Allen (Missy), defendant's ex-wife. Missy had three children, Keely, Hannah, and Natalie. Defendant is the father of Natalie and Hannah. Donald and Denise also had two sons, Cody Collard and Joe Collard. Fewer than one thousand people resided in Pleasant Hill. It was "very common for people" to go to Chief Orr's residence to report an issue or to contact him via his cell number. Natalie attended school with Chief Orr's daughter, and he had seen defendant at school events. Defendant was commonly known as C.T.

¶ 8    Chief Orr testified, on March 26, 2019, just before 11 p.m., he was awakened by Missy repeatedly screaming his name at the doorway to his bedroom. Missy was hyperventilating, sobbing, and crying. Missy repeated, "C.T. stabbed him." Chief Orr called 911. While on the phone, Chief Orr learned the victim was Donald, Missy's father. Chief Orr and Missy got into the chief's squad car and drove one block to Donald's residence. Donald was on the kitchen floor. He had multiple stab wounds. Donald stopped breathing in the two to three minutes it took for the first responders to arrive.

¶ 9    Chief Orr testified he saw Denise crying and sitting on the couch. Missy reported, "Natalie is in the bedroom." Natalie showed Chief Orr a Snapchat message from her stepsister.

¶ 10    On cross-examination, defense counsel showed Chief Orr photos of defendant that were taken the night of the stabbing. Defendant "had some marks" or "bruising" on his left side or cheek. After defendant was extradited to Illinois, Chief Orr briefly saw defendant. He could not recall if there was bruising at that time. Chief Orr testified he recorded videos of almost every witness, including Faith Henry, defendant's stepdaughter.

¶ 11        Denise testified Donald was born on June 21, 1953. Over the years, Donald had multiple health issues. In 2010, he had esophageal cancer. In 2011, half of his stomach and two-thirds of his esophagus were removed. In 2013, Donald suffered a stroke. As a result of the stroke, Donald's vision was impacted. He could see only peripherally from his right eye. From his left eye, he could see forward but not peripherally. Donald also suffered back problems, which forced him to retire early in 1995 or 1996 from his job as a maintenance worker. Donald's activities were limited. "[H]e would have to sit down or lay down *** for a while." His energy level was low "[a]lmost zero" before his death. Donald "would work a little bit, maybe a half hour or so, and he would take several naps and stuff throughout the day."

¶ 12        According to Denise, defendant was formerly her son-in-law. Donald had said he would like to "knock [defendant] on his ass" because of how defendant treated their granddaughters. Denise testified defendant "would promise the granddaughters to be at basketball games or Senior Night and not show." Donald's statement had been made several years earlier. Since that time, Donald and defendant had talked over the phone just "the Christmas before." Defendant was going to make a chandelier from deer horns for Donald. They also saw defendant at Hannah's graduation. There were times the two got along. Hannah graduated from high school in 2018.

¶ 13        Denise further testified, on March 26, 2019, Donald and Denise had dinner with their granddaughter, Natalie. After dinner, they were joined by Cody, Joe, and Joe's wife and children for cake and ice cream for Cody's birthday. At some point in the evening, the rest of the family left. Donald and Denise watched television. Natalie later contacted Denise, asking to be picked up from her house where she resided with her mother, Missy. Denise believed Natalie would stay the night with her and Donald. As they were driving back to Denise's house, Natalie

- 4 -

told her defendant was coming to pick her up. The two sat on the porch together for a time. While there, Natalie received a telephone call. Natalie provided directions to Denise's house. Denise also received a phone call from Cody and from Missy. Cody told Denise to not let Natalie go with defendant. Missy told Denise the same. Denise told Missy to come to the house. At some point, Natalie entered the house.

¶ 14    According to Denise, after she hung up from talking with Missy, Denise entered the house and told Natalie, who was sitting in the recliner, that she was "not going with [her] dad." Natalie became "really upset," cried, yelled at her grandmother she was done with her, and went into the bathroom. Missy arrived 10 to 15 minutes later. Missy tried to get Natalie out of the bathroom. At some point, Donald and Denise were in the kitchen with Missy. Donald said "a mysterious vehicle" with Missouri plates pulled up to the house. It was dark. Denise asked Donald to go outside to see what was going on. Missy told him not to and said it was defendant. Missy said she would go outside. Donald remarked, "No. If anybody's going out there, I am." When Donald returned to the house, he had been stabbed.

¶ 15    On cross-examination, Denise testified Natalie initially called her because she was upset that Missy had gone out with some friends. Natalie was upset Missy had been drinking and told Denise, "I'm done with mother." Denise agreed she told Chief Orr Natalie had been humiliated by her mother. Natalie told Denise she was going to her father's house in Louisiana, Missouri. Denise told Natalie she was not going with her father. Natalie was 16 years old at that time. When Donald went to confront whoever was in the truck, he was upset. He did not want Natalie to go with defendant.

¶ 16    Natalie testified her parents had been divorced for over 10 years. Natalie lived with her mother. Defendant lived in Louisiana, Missouri, with his wife and his stepdaughter,

Faith. Natalie usually saw her father every other weekend. Natalie was "[n]ot really" close with Faith. Defendant carried knives. He had one on a string around his neck. He wore it under his shirt.

¶ 17      The weekend before Donald's death, Natalie was at defendant's house. Natalie "barely" saw her father as he would "avoid" her. Natalie had a boyfriend, Brandon Knight, who lived close to her father's house. That weekend was the first time Natalie visited Knight. They visited at defendant's house. On March 26, 2019, that afternoon and evening, Natalie communicated with defendant through text messages and phone calls. When defendant asked who Natalie wanted to pick her up, Natalie said Faith.

¶ 18      According to Natalie, after she left the porch of her grandparents' house and went inside, she sat in the chair and talked to Donald. Donald told her "he was always going to be there for me no matter what and that everyone else could give up but he wouldn't." When Denise entered the house and told Natalie she could not go, Natalie became upset and locked herself in the bathroom. While in the bathroom, Natalie received a call from Faith. Natalie told Faith she was not allowed to go and told Faith and defendant to leave. The next thing Natalie remembered was her grandmother running through the house screaming Donald had been stabbed.

¶ 19      That night, Natalie and Faith were sending Snapchat messages to each other. Natalie took screen shots of some of those messages. One said, "He stabbed him. My grandpa is dying. I don't know what to do but this isn't going to be good."

¶ 20      Natalie further testified regarding the phone records of her messages with her father on March 26, 2019. At 3:29 p.m., defendant texted, asking Natalie what she was doing. Natalie responded she was doing her laundry and waiting for her tutor. She asked defendant what he was doing. Defendant responded: "TV. Wondering when you're coming over again."

Defendant also texted, "Sorry about the other day. I was having a very bad day, feeling better now. I love you. I want to meet your boyfriend. Sounds like a good dude." At 4:40 p.m., Natalie told defendant the following: "I love you, too, and, yeah, mom doesn't like him but her opinion doesn't matter to me because he treats me how a woman should be treated and, yeah, I'll bring him over again sometime. I'm planning on doing my every other weekend so I can come over more." Defendant responded, "Cool, Nat. It's your right. You can come over any time you want to stay or not. It's up to you. You worry too much. So quit, okay?"

¶ 21    The next message Natalie received was an instant message from Denise about dinner. Natalie then texted defendant, saying, "I'm just a worrier." At 5:51 p.m., defendant responded as follows:

> "So was I and after enough was enough I threw caution straight in the f*** wind and achieved more than most. And you know I wouldn't change it. I wasn't the greatest person by means, was what I was. That's what you need to do. I took a foreman job when we merged with Santa Fe but I did. F*** everyone. I ain't a p***. *** I'm a f*** leader and you are too. You just need a little time with me. No one's taught you the real fundamentals. If you can't trust yourself, you'll truly trust no one. I'm always here and the door's always open. Love you."

¶ 22    Natalie further read the text messages she and her father exchanged beginning at 8:16 p.m.:

> "Q. Okay. What does your dad say to you at 8:16 p.m.?
>
> A. He said, 'Nat, will you please come move in? I miss you

and I love you.'

Q. Okay. And what did you tell him?

A. 'I would love to come move in and stuff. I just don't know how to go about it.'

Q. And then what did he say back to you?

A. 'Come on over, Nat, or I'll have someone come get you. Nobody, not even a cop, can do anything.'

Q. And did he say something else after that?

A. He said, 'Or I'll call CPS.'

Q. And so did you send him a response back?

A. 'I just don't know what to do.'

Q. And what did he say?

A. 'Yes, you do. Just leave. There's no repercussion on you other than having a new start, better life. F*** it. I'll come get you now if you want to. F*** everyone, not a damn thing they can do no matter what.'

Q. And then what'd you say to him?

A. 'I always end up feeling guilty.'

Q. And can you tell me what time you sent that text?

A. At 8:45 p.m.

Q. And what was the next text message your dad sent to you then?

A. 'Well, f*** quit. Does anyone else? F*** no. Come here

and stay.'

> Q. And then what's the next text message?
>
> A. He said, 'Someone will come get you.'
>
> Q. And what time is it?
>
> A. At 9:06 p.m."

¶ 23　　Natalie testified she and her mother then had an argument. Natalie had not told defendant about that argument. Natalie called her grandmother. She then asked defendant who would pick her up. The defendant responded, "Anyone you want." Natalie said to send Faith. At 9:22 p.m., defendant texted Natalie, "This b*** ends with everyone now." Natalie told defendant to pick her up at her grandmother's. Defendant asked, "K. Fay or me?" Natalie responded, "Faith." Defendant told Natalie, "Grab nothing. I don't care. It's replaceable. I'll make sure you don't do without." At 9:29 p.m., Natalie texted Faith, "I'm leaving my house" and "I'm coming over there. My mom has done me in." Natalie later texted Faith, "I'm at my grandma's." Faith texted Natalie at 9:30 p.m., "I'm coming." Defendant texted, asking Natalie to text Faith the address. He indicated they were on the way. At 9:47 p.m., defendant texted, "Are you supposed to be staying the night there or was your mom supposed to be picking you up?" Natalie responded, "I left my house to come here because mom's drunk and was being ridiculous." Defendant asked, "Does your mom know you left?" Natalie said she did.

¶ 24　　Natalie then received a text from her mother. She said to please call her. "Cody and I have had a talk about stuff." At 10:36 p.m., Natalie received a call from her mother that lasted about 3 minutes. At 10:53 p.m., Natalie received a call from Faith, telling Natalie she and defendant had arrived. Natalie expressed she could not come out and told Faith and defendant to leave. At 10:58 p.m., Natalie called 911.

¶ 25 On cross-examination, Natalie testified she still lived with her mother. Natalie did not think there was an issue between Donald and defendant.

¶ 26 Missy testified she and defendant married in February 2000. They separated in December 2006 and divorced in 2008 or 2009. In March 2019, Missy and Natalie were having issues. Natalie was running around with the "wrong crowd." By "wrong crowd," Missy was referring to Natalie's boyfriend. One evening Natalie did not return home; she was with her boyfriend. Missy filed a missing person's report. Before the last weekend Natalie spent at her father's house, Missy attempted to talk with defendant multiple times about Natalie's medication regimen. Defendant was not responsive to her attempts.

¶ 27 According to Missy, on March 24, 2019, at 5:23 p.m., Missy texted defendant the following: "So, you know she's dating a drug dealer? And you're fine with that?" She further texted, "So, you're fine with the fact that her boyfriend[']s a drug dealer and she doesn't want to finish high school??" At 7:52 p.m., Missy forwarded to defendant a screen shot of a Snapchat message sent to her. There was a photo of a gun on a lap, purportedly Natalie's. Underneath the photo, on which an angry emoji was posted, Missy texted: "Do you know your daughter[']s boyfriend is a well[-]know[n] drug dealer and if you let her hang out with him this weekend, this is what she was doing?"

¶ 28 On March 26, 2019, Missy told her parents not to let Natalie go with her dad. Missy began the four- or five-minute drive to her parents' house. On the way, Missy called to tell defendant not to worry about driving over and that she had the situation under control. Defendant began yelling at Missy. He was very irate. Missy testified she had never heard him that angry. Defendant did not like how Missy was handling Natalie's situations. They "had a lot of disagreements about parenting Natalie." Defendant hung up on Missy. Missy texted defendant,

"Call me now."

¶ 29    Missy testified she arrived at her parents' house around 10 p.m. Natalie was locked in the bathroom. Missy tried to talk her out of the bathroom with no success. A truck pulled up. Missy assumed it was defendant. She and Donald "had a little back and forth argument about who was going out." Donald told Missy to stay inside and call the police. Missy attempted to contact Chief Orr and his wife. She also tried to call another Pleasant Hill police officer.

¶ 30    According to Missy, when her father returned to the house, he was grasping his chest and he said, "I think I've been stabbed." Missy ran out the door after the people in the truck. To get the truck to stop, Missy hit the back of the truck with her car. They were a block and a half or two blocks from her parents' house. Faith exited the truck and yelled, "Why did you hit us?" After Missy asked, "Why did he stab my dad," Faith yelled, "He said he tried to hit him." When Missy asked Faith what she was talking about, Faith pointed to the passenger seat of the truck and said, "Him." Missy saw defendant. Missy asked, "Why did you stab my dad?" Defendant replied, "Why did he try to hit me?" Later, Missy received a text from defendant: "What happened? I was just coming to get Natalie. Why was everyone mad? Why your dad punch me in the eye and s***?"

¶ 31    On cross-examination, Missy stated she did not keep Natalie from her dad, but she did not like her going over there. They fought "sometimes." Natalie did not like rules and Missy had rules and curfews at her house. Missy denied having a drinking problem; she acknowledged having a couple beers that night. Missy did not recall her father being in a bad mood. When they were going "back and forth" about who would go to the truck that pulled up, Missy said she would go as it was her business, but Donald said he would see who it was. They

were not fighting.

¶ 32    The coroner testified there were possibly four holes in the front of the jacket worn by Donald. The jacket was soaked with blood.

¶ 33    Dr. Amanda Youmans, a physician who specialized in forensic pathology, testified she performed the autopsy on Donald on March 27, 2019. There were four wounds to Donald's chest. Two penetrated the pericardial sac. One also penetrated Donald's heart. The wounds were one-and-three-quarter inches deep. Donald also had stab wounds on his right elbow and his left shoulder. Dr. Youmans opined the wound to the elbow was a defensive wound. Donald also had cuts on a finger on his right hand and on a finger on his left hand. Both were consistent with defensive wounds. Donald had evidence of natural disease, including hardening of the arteries. Donald also had chronic obstructive pulmonary disease and kidney disease. None of these issues contributed to the cause of death.

¶ 34    On cross-examination, Dr. Youmans testified the report indicates Donald weighed 190 pounds. Dr. Youmans testified Donald had 15 scars. She could not tell if some were surgical scars or inflicted by trauma as they were old scars. She acknowledged some could have been knife-wound scars or brawling scars. Dr. Youmans testified the first wound was inflicted front to back and downward. The second and third wounds were right to left. The fourth wound was upward. She agreed the wounds could be consistent with a struggle. The defensive wounds were also consistent with being in a struggle when a knife was involved.

¶ 35    On redirect examination, Dr. Youmans testified Donald was 5 feet, 7 inches tall.

¶ 36    Joshua Baker, chief deputy of the Pike County, Missouri, sheriff's office, chief of police for Frankfort, Missouri, and a police officer for Pleasant Hill, Illinois, testified he assisted in defendant's arrest in Louisiana, Missouri. Around midnight of March 27, 2019, defendant was

placed in handcuffs. Defendant said he had been in a physical altercation in Pleasant Hill with Donald. Chief Baker asked if a knife had been involved. Defendant said no knife was involved in the altercation. Chief Baker observed an injury to the left side of defendant's face. Defendant told the officer he changed his pants because they were wet. Defendant said he spilled something in the car. Chief Baker asked Faith to go the sheriff's office with him. On cross-examination, Chief Baker testified defendant was cooperative, polite, and noncombative.

¶ 37       David Carroll, a detective with Pike County Sheriff's Office, testified he retrieved the pants defendant wore when Donald was stabbed. Defendant told Detective Carroll he had spilled water on the pants. When Detective Carroll retrieved the pants from the living room floor, he found a pocketknife clipped to the pocket and a "Gerber knife" attached to the belt. The pants were damp. Defendant had an injury to his face and cuts on his hand.

¶ 38       Defendant was taken to the sheriff's office. Detective Carroll explained he wanted photos taken of defendant because defendant had been involved in an altercation. Defendant denied being in a fight. He stated he was in the truck the entire time. Defendant had an injury to the left side of his face. Defendant also had a cut under his nose. There were some cuts and injuries to the defendant's nails, which defendant attributed to chewing his nails. Detective Carroll could smell "intoxicants" from defendant. On cross-examination, Detective Carroll testified he listed the weight in his report from defendant's driver's license as 155 pounds.

¶ 39       Defendant testified on his own behalf. Before leaving to pick up Natalie, defendant and Faith removed a rifle and a pistol he had in the vehicle because they did not know the Illinois laws on carrying guns. Faith drove because defendant did not drive at night due to his vision. Upon arriving at Donald's house, Faith turned off the engine and the headlights. Faith was communicating with Natalie and relaying "bits and pieces" to defendant. Defendant knew

- 13 -

Natalie had locked herself in the bathroom. Neither defendant nor Faith exited the truck. They were parked on a public street and did not honk the horn or make a "ruckus."

¶ 40    Donald approached the truck. Defendant asked Donald where Natalie was. Donald responded he "ought to kick [his] scrawny little a\*\*\*." Defendant was surprised by Donald's attitude. He thought Donald liked him. Donald walked from the driver's side to the passenger side of the truck. Donald reached through the window on defendant's side, grabbed defendant with his left hand, and started punching defendant in the face with his right hand. Donald was "[p]ulling and jerking and trying to pull [defendant's] head out the window." Defendant testified: "After he hit me a couple times, that's when I released my knife and just started flailing because my stepdaughter had jumped over and was smacking at him, and I was just flailing." Faith was trying to protect defendant. She told Donald to stop hitting her dad. Donald did not stop hitting defendant. He had defendant by the neck, trying to jerk him out of the window. Defendant could not reach the knife he had on his side. Donald had his head and shoulders inside the truck window. The attack surprised defendant. When defendant was "flailing," he was not aiming in a particular direction. Defendant could not see anything; he was flailing and trying to hold his dog and stepdaughter back. Defendant testified he was facing Faith and was flailing back toward Donald.

¶ 41    Defendant testified he was not in a position to direct the knife. He was using the knife to get Donald to let him go and stop hitting him. Donald was in a rage, "just pulling and jerking and hitting." Defendant testified he did not intend to kill Donald. After Donald backed away from the truck, defendant told Faith to drive away. As far as defendant could tell, Donald was still standing when they pulled away. Faith suffered a cut finger and her blood was found on the passenger door.

- 14 -

¶ 42            On cross-examination, defendant testified he went with Faith because they were driving his truck and he wanted to get his daughter who was upset. When Donald stepped back from the truck, Donald said, "You son-of-a-b***, you cut me." Defendant admitted he lied when Chief Deputy Baker asked about a knife and said he did not have one. Defendant testified he did not know he stabbed Donald in the heart. When officers asked defendant if he hit Donald during the struggle, defendant said, "I didn't have a chance." Defendant admitted lying to a sergeant when asked about a knife, stating, "I mean I had one on my side but I never touched it." Defendant agreed he changed the story after he realized "there was no way around the fact that there were stab wounds in [Donald']s chest." When asked what happened to the knife that was used to stab Donald, defendant testified to the following: "That knife was the one I had used that was under my shirt, that survival tactical knife that I use at the farm. And when we had left, I'd gotten scared, and I had throwed it out the window." When questioned by the police if he threw anything out, defendant shook his head.

¶ 43            Defendant offered into evidence a video recording of a police interview of Faith. According to statements by counsel in the record, shortly after Donald's death, Faith was interviewed by police. Following that interview, the State charged Faith with multiple felonies related to the incident. Faith's counsel informed the trial court Faith, if called as a witness, would invoke the protections of the Fifth Amendment and would not testify in defendant's trial. The court ruled the State could not call Faith as a witness. The State objected to the admission of the videotaped interview on hearsay grounds. The court sustained the State's objection.

¶ 44                                    C. Deliberations

¶ 45            At 2:31 p.m., the jury exited the courtroom to begin deliberations.

¶ 46            Some time later, the time was not specified in the record, two questions were sent

from the jury, requesting to see a DNA report and a transcript of an interview.

¶ 47　　　At another unspecified time, the court received a copy of a question from the jury: "We have a juror who cannot, due to her religious beliefs, make a decision on any matter. She said she notified the court in the jury selection, the juror named Mary Davis. What do we do?" Defense counsel's comments show this question was sent to the trial court over two hours after deliberations began: "They were in deliberations for over two hours and then they send this note out." The State recommended replacing Davis with an alternate. Defense counsel objected, arguing Davis had not earlier voiced her concern and she should fulfill her duty.

¶ 48　　　The trial court concluded it would question Davis before proceeding:

"I have a juror that, if this statement—and I think I need to confirm that statement to be true without asking anything about deliberations, and if she indicates that because of religious beliefs she cannot make a decision, that she cannot fulfill her oath as to what she took when we swore her in, then I think the next step would be to go to alternate number one, do an *in camera* and make sure she hasn't discussed that with anyone or reached any opinion[.] [A]nd then if she says that, that she hasn't, which is what I instructed both of them to do before they left, then I agree that we would bring the whole panel out, or the whole jury out, with Ms. Bareis, and then tell them to begin deliberations anew."

¶ 49　　　The trial court then held proceedings outside the jury's presence:

"THE COURT: Hello. You want to have a seat there real quick?

MS. DAVIS: Yes.

THE COURT: Okay. We're in my conference room. Present is Ms. Mary Davis. Present is the defendant, his attorney, and the [S]tate.

Ms. Davis, I was given a note from the jury, and I'm assuming you're aware of it, 'We have a juror who cannot, due to her religious beliefs, make a decision on any matter,' and then they listed your name, Mary Davis.

MS. DAVIS: Uh-huh.

THE COURT: Is that, in fact, a correct statement?

MS. DAVIS: Yes, that's not my job. God will do it.

THE COURT: *** And you didn't recall being asked that during *voir dire*?

MS. DAVIS: Yes. And I remember saying to [the circuit clerk] there that I didn't think I could do it, that I thought that was up to God.

THE COURT: *** So, but, that is the reason you—that is the sole and only reason you cannot make a decision is your religious beliefs; is that correct?

MS. DAVIS: Yes. I don't know anybody.

THE COURT: Right. I just wanted to make sure the record was clear. Okay. All right. That you for your service. You're discharged.

\*\*\*

THE COURT: Hello. Just have a seat there, Ms. Bareis.

MS. BAREIS: Okay.

THE COURT: Ms. Bareis, you were alternate number one.

MS. BAREIS: Okay.

THE COURT: We've had a situation develop with one of our jurors and we've excused her so you are next up.

MS. BAREIS: Okay.

THE COURT: My question to you is—

And we're still in chambers. The defendant and counsel are present. We're outside the presence of the rest of the jury. The [S]tate is also present.

And as I had instructed you and Mr. Foreman before you left not to discuss the case with anyone, did you, in fact, discuss it with anyone?

MS. BAREIS: No.

THE COURT: Okay. Have you formed any opinions about the case whatsoever?

MS. BAREIS: No.

THE COURT: Okay. Is there any reason that you would not be able to go into deliberations now, that you know of?

MS. BAREIS: No.

THE COURT: Okay. I think we're okay then."

¶ 50        The jury was called back in. The trial court instructed the jury "to begin your

deliberations anew." The court emphasized, "You're starting over," and told the jury that "Ms.

Bareis was not part of it and you will begin that now." After telling the jury the bailiff would be

getting dinner for them, the court reiterated, "[I]t's important that you guys begin your

deliberations anew."

¶ 51        At 6:10 p.m., the trial court was informed the jury had a verdict. Defendant was

found guilty of first degree murder.

¶ 52                                    D. Sentencing

¶ 53        At the hearing, the State began by stating the appropriate sentencing range, given

the age of the victim, was 20 to 100 years in prison. The State noted defendant's lack of a violent

history but asked, "in light of everything," for a sentence of 50 years.

¶ 54        Defense counsel read from the presentence report (PSI):

"According to statements made by Faith Henry and

[defendant], they indicated they arrived at Donald Collard's

residence in order to pick up [defendant's] daughter. Both stated

that Donald exited his residence and initially approached the

driver's side of the truck in order to confront [defendant], and an

argument ensued to which Donald walked around the truck to the

passenger-side door where [defendant] was seated and a physical

altercation occurred which ultimately led to the injuries sustained

to Donald Collard.

Her videotaped statements, two of them, were to the effect

just like [defendant] testified in court, that she was over in his lap

- 19 -

trying to fight off Mr. Collard and get him to turn [defendant]

loose, to no avail. She got herself in trouble when she first denied

seeing the knife and then said, admitted, 'Yes, I did see the

knife.' "

¶ 55    Defense counsel admitted he should have asked the trial court to try Faith first but did not think of that until when Faith's counsel "wouldn't cooperate right up to the day of trial." Defense counsel asked these facts to be considered when imposing the sentence.

¶ 56    The trial court began by stating the sentencing range as 20 to 100 years. The court addressed the factors in mitigation. The court said it did not know whether defendant did not contemplate his criminal conduct would cause or threaten serious physical harm. The court agreed defendant did not go to Donald's house thinking the events would occur, but the court concluded, "[I]f you use a knife and strike someone repeatedly, you got to know that that's going to cause great bodily harm or death." The court found the mitigating factor that did apply was defendant's lack of criminal history. The court observed other than some conservation-related offenses, defendant was a law-abiding citizen. The trial court sentenced defendant to 44 years' imprisonment.

¶ 57                              E. Posttrial

¶ 58    In his posttrial motion, defendant challenged the juror replacement, arguing the trial court should have ordered Davis to fulfill her duty, which would likely have resulted in a mistrial. In the debate over the posttrial motion, the trial court agreed the verdict arrived "roughly 45 minutes, less than an hour later" after the alternate juror was placed on the panel. The court denied the motion.

¶ 59    This appeal followed.

¶ 60                                    II. ANALYSIS

¶ 61                          A. Right to an Impartial Jury

¶ 62        Defendant argues the trial court denied his right to a unanimous jury verdict when it dismissed a juror during deliberations. Defendant emphasizes that juror, Davis, answered repeated questions in a manner showing moral or religious beliefs would not prevent her from rendering a decision in the case but, after submission to the jury, asserted religious beliefs prevented her from deciding the case. In support of his argument, defendant relies heavily on one case, *People v. Gallano*, 354 Ill. App. 3d 941, 821 N.E.2d 1214 (2004).

¶ 63        A determination as to whether a juror should be replaced "postsubmission" to the jury is viewed as a matter within the discretion of the trial court. *People v. Roberts*, 214 Ill. 2d 106, 121, 824 N.E.2d 250, 259 (2005). In general, jury selection and management matters are within the trial court's discretion. *Id.* "In determining whether the trial court abused its discretion, the primary consideration must be the potential prejudice to the defendant as a result of the postsubmission replacement." *Id.*

¶ 64        Defendant has not convinced this court he suffered prejudice. Defendant's argument is based solely on *Gallano*. *Gallano* is, however, distinguishable and does not establish prejudice. In *Gallano*, the replaced juror was excused after telling the court his "mind cannot be changed because [he] feel[s] some reasonable doubt." *Gallano*, 354 Ill. App. 3d at 949. After receiving the juror's note, the court learned the juror had been untruthful during *voir dire* about his prior arrests. *Id.* at 950-51. The court then dismissed the juror and replaced him with an alternate. *Id.* at 951-52. The jury found defendant guilty. *Id.* at 952. On appeal, the reviewing court determined error had occurred. *Id.* at 955. Despite the State's assertions the juror was dismissed because of his untruthfulness during *voir dire*, the reviewing court concluded "where

the record shows any reasonable possibility that the impetus for a juror's dismissal during deliberations stems from his views regarding the sufficiency of the evidence, the dismissal of that juror constitutes error." *Id.* at 954.

¶ 65        Unlike in *Gallano*, where the juror expressly indicated he had found reasonable doubt, there is no evidence in the record showing Davis had reached any decision on the matter. In fact, both the letter from the jury and the trial court's interview of Davis show Davis had made no decision on the evidence. The letter states, "We have a juror who cannot, due to her religious beliefs, make a decision on any matter." Davis verified that statement as true. While the record shows Davis answered in the negative when the group was at least twice asked if religious or moral beliefs would prevent them from judging another, Davis had stated to the trial court she had expressed concern to the court clerk. *Gallano* does not establish reversal is required, as we find no reasonable possibility the impetus for Davis's removal was due to a concern about the sufficiency of the evidence.

¶ 66                          B. Faith's Videotaped Evidence

¶ 67        Defendant argues the trial court erred in denying his motion to admit the videotaped evidence of Faith's statement to the police. Defendant contends the statement, although inadmissible as hearsay, is admissible under the exception that permits the admission of such evidence when justice requires.

¶ 68        The State counters by arguing, in part, defendant has not included the videotaped statement in the record and, therefore, the matter should be resolved against defendant. In his reply brief, defendant does not contradict the State's argument or identify a place in the record where that offered evidence appears.

¶ 69        The absence of the videotaped statement is fatal to defendant's claim. Even if this

court could find the evidence should have been admitted based on the general description of the contents of that videotaped statement, reversal is not required if that alleged error is harmless. See *People v. Whitfield*, 2017 IL App (2d) 140878, ¶ 102, 78 N.E.3d 1015 (Evidentiary errors may be harmless.). In considering whether a nonconstitutional evidentiary error is harmless, we consider whether there is a reasonable probability the jury would have acquitted defendant absent the error. *People v. Forrest*, 2015 IL App (4th) 130621, ¶ 57, 40 N.E.3d 477. If there is no such probability, harmless error will be found and the trial court's decision affirmed. See *id.* ¶¶ 57, 60, 66. Here, without the video recording, this analysis may not be undertaken.

¶ 70 Defendant, as the appellant, had the burden to provide on appeal a record sufficiently complete to fully inform this court of the issues. *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 34, 170 N.E.3d 1064. Doubts that arise from an incomplete record must be resolved against the appellant. *Id.* Because we do not have the video recording or a transcript of that recording, we resolve any doubts as to the harmlessness of the alleged error against defendant. Accordingly, we find, even if there was error in excluding the video recording, that error was harmless.

¶ 71 C. Sentencing

¶ 72 Defendant next argues his 44-year sentence is excessive and violates the Illinois constitution's mandate a penalty be framed "with the objective of restoring the offender to useful citizenship" (Ill. Const. 1970, art. 1, § 11). Defendant emphasizes the circumstances of the offense show he did not intend to kill Donald, the lengthy sentence was effectively a life sentence, he lacked a violent history, and he generally led a law-abiding life. Defendant points to the fact the General Assembly permits a minimum sentence of 20 years for first degree murder and contends "[i]f this is not the type to call for a sentence closer to the minimum then how can

- 23 -

one distinguish between this case and a case involving a defendant with a violent criminal history who planned and intended to kill his victim?"

¶ 73    The Illinois Constitution mandates courts, in fashioning a sentence, determine a penalty "according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. The sentencing court should consider the seriousness of the offense, the need to protect society, the need for deterrence and punishment, in addition to the history, character, and rehabilitative potential of the defendant. See *People v. Hestand*, 362 Ill. App. 3d 272, 281, 838 N.E.2d 318, 326 (2005). These factors must be weighed equally. *People v. Lawson*, 2018 IL App (4th) 170105, ¶ 33, 102 N.E.3d 761. The trial court has discretion in sentencing matters, meaning this court will not reverse or modify a sentence absent a finding the court abused that discretion. See *People v. Snyder*, 2011 IL 111382, ¶ 36, 959 N.E.2d 656; see also *Lawson*, 2018 IL App (4th) 170105, ¶ 28. A sentence is an abuse of discretion if it is fanciful, arbitrary, or unreasonable, if it is at great variance with the purpose and spirit of the law, or if it is manifestly disproportionate to the nature of the crime. *Id.*

¶ 74    In this case, defendant was sentenced for the first degree murder of Donald, a victim over the age of 60. Section 5-4.5-20 of the Unified Code of Corrections sets forth the terms of imprisonment for first degree murder: "Imprisonment shall be for a determinate term *** of (1) not less than 20 years and not more than 60 years; (2) not less than 60 years and not more than 100 years when an extended term is imposed under Section 5-8-2 (730 ILCS 5/5-8-2); or (3) natural life." 730 ILCS 5/5-4.5-20(a) (West 2018). Section 5-8-2 permits an extended-term sentence of 60 to 100 years for first degree murder when the victim of the felony was "a person 60 years of age or older." 730 ILCS 5/5-5-3.2(b)(3)(ii) (West 2018). In this case, the trial court elected not to sentence defendant to an extended term, although the statute allowed it to do so.

¶ 75 Defendant's sentence is neither fanciful, arbitrary, nor unreasonable. It is also not manifestly disproportionate to the nature of defendant's first degree murder of Donald or greatly at variance with the purpose and spirit of the law. Defendant's sentence fell within the sentencing range. The age of the victim, which allowed the imposition of an extended-term sentence, also was an aggravated factor the trial court was required to weigh in imposing defendant's sentence. See 730 ILCS 5/5-5-3.2(a)(8) (West 2018). Given the victim's age, the senselessness of the offense, and the circumstances of the offense, including defendant's flight from the scene, lies to the interviewing officer, and disposal of the weapon, the 44-year sentence is not an abuse of discretion.

¶ 76                                    III. CONCLUSION

¶ 77        For the reasons stated, we affirm the trial court's judgment.

¶ 78        Affirmed.